[No. 26631. Department One. October 11, 1937.]

ELMONTE INVESTMENT COMPANY, *Appellant,* v. SCHAFER
BROS. LOGGING COMPANY, *Respondent,* C. H.
CLEMONS *et al., Defendants.*[1]

[1]Reported in 72 P. (2d) 311.

*T. H. McKay* and *Frank Groundwater*, for appellant.
*Weter, Roberts & Shefelman* and *Charles C. Hall*, for respondent.

MILLARD, J.—In January, 1925, C. H. Clemons and wife sold the Wynooche Timber Company all the merchantable timber upon a tract of land owned by them in Grays Harbor county. Under the terms of that contract, the timber company was given seven years in which to remove the timber. On September 30, 1927, Clemons and wife executed a mortgage to the Elmonte Investment Company, a domestic corporation, to secure payment on or before September 30, 1930, of the mortgagors' note to the mortgagee. In November, 1930, at which time the note just described was past due and no timber had been removed from the land in question, Clemons and wife, for a consideration of fifteen hundred dollars, entered into an agreement with the Schafer Bros. Logging Company, successor in interest of the Wynooche Timber Company, under which the time for removal of the timber was extended from January 10, 1932, to January 10, 1942.

An action was commenced by the Elmonte Investment Company to recover on its note and to foreclose its mortgage against Clemons and wife and other defendants, including the Schafer Bros. Logging Company, claiming an interest or some right in or to the property covered by the mortgage. Clemons and wife offered no defense. The logging company's defense

was to the effect that the extension agreement described above was executed with the knowledge of the plaintiff, who made no attempt to apprise the logging company of the plaintiff's claimed rights under its mortgage, of which the logging company had no knowledge, or to object to the extension agreement; and that plaintiff is estopped to assert any rights as against the timber, on which it was not intended that plaintiff should have a mortgage.

The cause was tried to the court. Expressing the view that, upon its execution and delivery in January, 1925, the timber deed immediately passed the title in the timber from Clemons and wife and vested it in the grantee and the timber then immediately became personal property, or, if the timber did not then become personal property, by the timber deed the estate in the timber and the estate in the land were immediately separated, the estate in the land remaining in Clemons and wife and the estate in the timber immediately vesting in the grantee, the trial court made findings of fact, which are summarized as follows:

In March, 1919, Clemons and wife mortgaged to W. H. France, trustee, a large quantity of land, in which was included the tract which is the subject matter of this controversy. In January, 1925, Mr. France released from the mortgage all the merchantable timber situated upon that tract. On January 10, 1925, Clemons and wife, by a timber deed, sold to the Wynooche Timber Company all of the merchantable timber situated upon the tract mortgaged in 1919 to W. H. France, trustee. Under the terms of this timber deed, the Wynooche Timber Company was given seven years in which to remove the timber, "and if not so removed the same shall revert to the parties of the first part [the vendors]." That instrument was

duly placed of record in the office of the county auditor on January 15, 1925.

On July 18, 1925, the Wynooche Timber Company sold· to Schafer Brothers Timber Company all of the former's rights under the timber deed. The instrument transferring the property was duly placed of record in the office of the county auditor. The Schafer Brothers Logging Company, a corporation, succeeded to the rights of the Schafer Brothers Timber Company, which had ceased to exist. The owners of the capital stock of the logging company were Peter Schafer, Albert Schafer, and Hubert Schafer, now deceased.

On September 30, 1927, Clemons and wife executed and delivered to the Elmonte Investment Company a promissory note in the amount of nine thousand dollars, and to secure payment of that note, they mortgaged to the Elmonte Investment Company the land in controversy. There is no language in the mortgage excepting the timber. This mortgage contains the usual habendum clause, reading as follows:

"To HAVE AND TO HOLD, the premises aforesaid, with all and singular, the rights, privileges, appurtenances, and immunities thereunto belonging, or in any wise appertaining unto the said party of the second part, and unto its heirs and assigns forever, the said first parties hereby covenanting that they are lawfully seized of an indefeasible estate, in fee, in the premises herein conveyed, that they have good right to convey the same; that the said premises are free and clear of any insurance done or suffered by them or those under whom they claim; and that they will warrant and defend the title to the said premises unto the said party of the second part, and unto its heirs and assigns forever, against the lawful claims and demands of all persons whomsoever."

This mortgage was duly recorded. While the note and mortgage were in the amount of nine thousand

dollars, only three thousand dollars were actually advanced to the mortgagors, six thousand dollars representing a past indebtedness.

On November 27, 1928, Clemons and wife executed and delivered to the Montesano State Bank a mortgage on all their remaining real property except their farm, which mortgage was assigned by the bank to the Elmonte Investment Company.

Shortly subsequent to the recordation of the timber deed from the Wynooche Timber Company to Schafer Brothers Company, in the course of the year of 1925, the county assessor segregated on his rolls the timber and the land described in the timber deed. The timber was then, and up to the present time has been, assessed and taxed separately from the land and as personal property. The taxes on the timber have ever since such segregation been assessed to and paid by the Schafer Brothers companies. None of the timber described in the deed of January 10, 1925, has ever been cut or removed. Nothing has been paid by Clemons and wife on the principal of the notes and mortgages.

France and one Devonshire, who are officers of the Elmonte Investment Company, have lived in and around Montesano for many years, as have the Schafers and Clemons and wife. W. H. France has been the cashier and one of the managing officers of the Montesano State Bank, which has been in business in Montesano for many years. Mr. Devonshire has also been an officer of the bank during all of that period. The Elmonte Investment Company is and has been for many years a subsidiary of the bank. During all of that time, W. H. France has been the treasurer and manager of the investment company.

The Clemons, the Schafers, France, and Devonshire have been residents in the community of Montesano for forty years and have all been well acquainted with

each other during that period. The Schafer Brothers companies have had an account in the Montesano State Bank for many years.

In November, 1930, while the time granted in the original timber deed had approximately twenty-six months to run and none of the timber had been removed, Clemons and wife executed an extension agreement granting to Schafer Brothers Logging Company an additional ten years from January 10, 1932, in which to cut and remove the merchantable timber on the land included in the original timber deed. The consideration for the extension was the payment of fifteen hundred dollars by the Schafer Brothers Logging Company to Clemons and wife and the release by the logging company of its rights to timber situated upon another tract of land. As a further consideration for the extension of time, the logging company agreed to pay all taxes levied on the land described in the timber deed subsequent to the date of the extension agreement in addition to paying taxes on the timber. The extension agreement was duly executed, acknowledged and delivered by Clemons and wife, but was not filed of record.

On March 1, 1919, Clemons and wife mortgaged a large quantity of land to W. H. France, trustee, to secure the payment of thirty thousand dollars. This mortgage was satisfied of record on April 2, 1919, "by W. H. France, Cashier" of the Montesano State Bank. It was later again satisfied by W. H. France, trustee. This later satisfaction was probably made because of a supposed erroneous satisfaction on April 2, resulting from the description of France as cashier.

On March 31, 1919, Clemons mortgaged to W. H. France, trustee, the same land described in the above mentioned mortgage. This mortgage was to secure the payment of thirty thousand dollars. These two

mortgages seemed to be identical. These mortgages were duly placed of record. This last mortgage was satisfied in full on December 8, 1926, by W. H. France, trustee.

On January 8, 1925, France executed and delivered· to Clemons and wife a release from the mortgage "of the merchantable timber situated upon" the land which is the subject of this controversy. On January 10, 1925, two days subsequent to the execution of the foregoing timber release, Clemons transferred by timber deed, referred to above, all of the merchantable timber upon the land to the Wynooche Timber Company. The timber release from France to the Clemons and the timber deed from the Clemons to the Wynooche Timber Company were placed of record on the same date, January 15, 1925.

Before he obtained the timber release of January 8, 1925, from Mr. France, Mr. Clemons told Mr. France of the purpose of the release and the pending timber transaction with the Wynooche Timber Company. When the mortgage from Clemons and wife to the Elmonte Investment Company was executed in September, 1927, the timber deed from Clemons to the Wynooche Timber Company—later transferred to the Schafer Brothers Company—had approximately four years and three months to run. On November 5, 1930, when the Schafer Brothers Logging Company was granted the extension by the·Clemons, the vendee had twenty-six months remaining under the original timber deed in which to remove the timber.

During the negotiations, which covered a period of two or three months, for the extension of November 5, 1930, Mr. Clemons discussed with W. H. France the pending negotiations with the Schafer Brothers companies for the extension. Peter Schafer also discussed with W. H. France the pending negotiations and com-

plained to France that Clemons wanted too much money for the extension. France agreed with Schafer that the twenty-five hundred dollars asked by Clemons for the extension was excessive and agreed to do what he could to have the amount reduced.

A Mr. Calder likewise discussed with W. H. France the negotiations for the extension of time by Clemons to the logging company. The latter informed Mr. Calder that he thought the price of twenty-five hundred dollars demanded by Clemons was excessive, and that he considered fifteen hundred dollars the maximum price which should be paid for the extension agreement.

The Schafer Brothers Company and its officers and representatives, and the Schafers themselves, did not know until the institution of this foreclosure action that Clemons, in September, 1927, mortgaged the land in question to the Elmonte Investment Company. At the time of the negotiations for the extension agreement, and when he had his conversation with Clemons, Peter Schafer and Calder, W. H. France

". . . was fully conscious of the timber involved and that his institution held a mortgage upon the land upon which said timber was standing. He remained silent and made no mention to any of the parties that he intended to claim that his mortgage was a lien on the timber, and did not inform the Schafers of that fact, and W. H. France made no mention of the Elmonte Investment Co. mortgage. If mention thereof had been made to the Schafers, they could have removed the timber during the remaining two years and two months allowed them under their original timber deed, and they would also have saved the $1500. purchase price paid for the extension.

"W. H. France was fully conscious of the timber transfer of 1925 from Clemons to Wynooche Timber Co. He released the timber from his mortgage for the specific purpose of permitting the transfer. W. H. France was also at all times fully aware of the fact

that in 1925 the Schafers bought out the Wynooche Timber Co. and became the owners of the timber in question. The mortgage given to secure the $9000. note as part of the description of Section 2 contains the recital 'lying west of the railroad right of way of Schafer Bros. Timber Co., successors to Wynooche Timber Co.' At the time of the execution of the timber deed by Clemons in 1925 the timber described in said deed was the only timber then left to Clemons. W. H. France was fully conversant with the Clemons' affair as a result of the close business contact between Clemons and the Clemons Logging Company on the one hand and the Montesano State Bank and W. H. France on the other hand, covering a long period of years immediately prior to 1925."

W. H. France testified that, in July, 1932, he first decided that the extension agreement which had been discussed with him in 1930, must have referred to the timber now in litigation. Between July, 1932, and the commencement of this action, W. H. France saw Peter Schafer and Albert Schafer and the officers of the Schafer Brothers companies frequently. However, he made no mention of the plaintiff's mortgage on the timber and made no claim that the plaintiff or he had any interest in or right to the timber. Between July, 1932, and the commencement of this action, when the Schafers were first informed of the plaintiff's claims, the Schafers paid three and one-half years taxes on the timber.

"In equity and good conscience plaintiff should have notified the Schafers of its mortgage upon the land upon which the timber was situated, and in equity and good conscience plaintiff is estopped to assert any claims against said timber arising out of said mortgage."

When Clemons and wife executed the mortgage in September, 1927, to secure payment of the note for nine thousand dollars, they did not intend to mortgage

the timber to the investment company, and when the investment company prepared the mortgage, it knew, through Mr. France, that Clemons and wife did not own the timber and knew that Clemons and wife did not intend to mortgage the timber to the investment company. With this full knowledge, the investment company included in its mortgage the common law covenants, which were immediately breached as soon as the Clemons signed the mortgage.

At the time of the trial, the timber was of the value of ten thousand dollars. The time remaining under the extension agreement—until January 10, 1942—is a reasonable time in which to allow the Schafers to cut and remove the timber. The rights of the investment company under its mortgage are junior and inferior to the rights of the logging company under its extension agreement. Clemons and wife defaulted in the payment of the note and mortgage, and plaintiff is entitled to foreclosure of its mortgage except as against the rights of the logging company.

From the foregoing findings of fact, the court concluded that the rights of the Schafer Brothers Logging Company, under the extension agreement of November 5, 1930, to the timber and to go upon the land for the purpose of cutting and removing the timber until January 10, 1942, are superior to the rights of the plaintiff by virtue of its mortgage, or otherwise; that plaintiff is in equity estopped by its conduct from asserting that it has any rights to the timber and the right to go upon the land as against the logging company, and the logging company may go upon the land and remove the timber at any time prior to January 10, 1942; and the time intervening up to that time is a reasonable time for the logging company to remove the timber. Plaintiff is entitled to judgment against Clemons and wife on the note in question, and also

to decree foreclosing the mortgage, except as to the rights of the logging company referred to above. From the judgment and decree entered in harmony with the foregoing, the plaintiff has appealed.

The question presented by this appeal is whether, where growing timber is sold apart from the land on which it stands and with a fixed time for its removal, and before the expiration of such time the land owner mortgages the land, the land owner may thereafter, without permission of the mortgagee, extend the time allowed for the removal of the timber, to the prejudice of the mortgage.

Counsel for respondent insist that the timber involved in the case at bar is personal property. It is argued that, upon a sale of standing timber separate from the land by an instrument sufficient to pass an interest in the land, the timber becomes personal property in contemplation of law, and a subsequent mortgage of the land will not include the timber; that, as the timber became personal property immediately upon constructive severance by the delivery of the timber deed, the respondent would not be charged with constructive notice of any attempted mortgaging of the possibility of reverter by the recording of a real estate mortgage.

We are not unfamiliar with the authorities cited to sustain the respondent's theory. In I Tiffany on Real Property (2d ed.), pp. 880-881, §§ 259 and 261, it is stated:

"If the ownership of any part of the vegetation has previously been vested in a person other than the owner of the land, it will not pass under a conveyance of the land by the latter, at least to one who knows of such severance of ownership, . . .

"Any growth of the soil, even though not produced by annual labor, is personalty after its actual severance from the soil by the owner of the land, as in the

case of timber cut by him. Furthermore, by the weight of authority, there may be constructive or legal severance of vegetable products while still growing or standing in the soil. Thus, it has been decided that, upon a conveyance by the landowner of growing trees apart from the land, they become personalty, and the same effect has been given to an exception of the trees on a conveyance of the land. By other decisions, while it is recognized that the ownership of the trees may be vested in a person other than the owner of the soil, they are regarded as still retaining the character of land, so long as they are rooted in the soil, . . .

"In order to effect a valid conveyance of growing trees, there must be a written instrument executed with the same formalities as are required in the transfer of a like interest in any other part of the land."

Counsel for respondent direct our attention to I Tiffany, Real Property (2d ed.), p. 882, § 261, where the "author also recognizes the existence of a minority rule" on the question whether timber under a deed like that in the case at bar is converted into personalty. Respondent's counsel also

". . . point out that the latest edition of 'Tiffany on Real Property,' the acknowledged leading text on this subject, in the 2nd Ed., Vol. I, page 882, Note 77, cites the *France* case, *France v. Deep River Logging Co.*, 79 Wash. 336, 140 Pac. 361, in support of the rule that a conveyance of timber with a provision for removal within a definite or reasonable time converts the timber into personalty, but that a conveyance of timber with a right of removal 'forever,' is a sale of an interest in real property."

It is urged on behalf of respondent that the rule which it seeks to invoke is primarily one of the intention of the parties as expressed in the instrument and as shown by the surrounding circumstances, and it becomes necessary to determine what the intention of the parties really was.

The trial court found that Clemons did not intend

to mortgage the timber to the appellant, and when the appellant prepared the mortgage, it knew, through Mr. France, that Clemons did not own the timber and knew that Clemons did not intend to mortgage the timber to the appellant.

The mortgage, which is in the standard form, does not contain any exception or reservation. It contains the usual habendum clause and covenants of warranty. It covered the lands, tenements, and hereditaments; therefore, the reversionary interest in the standing timber was included. We find nothing in the record to sustain the finding that Clemons and wife, the mortgagors, did not intend to mortgage the timber to the appellant. No contention has ever been made by Clemons that the mortgage did not correctly state the intention of the parties. It follows that the finding that Clemons and wife did not intend to mortgage the reversionary interest in the timber is not within the issues and the evidence, and may not be considered on appeal. Whatever interest the mortgagors had in the land at the time they executed and delivered the mortgage to appellant, was included in that mortgage.

The only evidence respecting the intention of the parties is the testimony of C. H. Clemons, one of respondent's witnesses, who testified that, at the time the mortgage was given, he did not tell Mr. France, nor did Mr. France say anything "indicating that he was getting a mortgage on the timber as well as the land." At the date the mortgage was given, the timber had not been severed; therefore, it was a part of the land. The timber in controversy was real property at the date the mortgage was given.

Despite the statement of the learned author of Tiffany on Real Property, we are not committed to the rule invoked by counsel for respondent. Respondent

insists that in *France v. Deep River Logging Co.,* 79 Wash. 336, 140 Pac. 361, Ann. Cas. 1916A, 238, we adhered to the rule that timber conveyed separate from the land becomes personal property where such is the intention of the parties; and that, in the case cited, we held that, where timber is conveyed with a right of entry on the land and removal forever, this in itself indicates an intention to place a permanent burden on the land and, therefore, must, of course, be deemed a conveyance of an interest in the land. From this, it is argued that a conveyance of the timber with the right of removal within a definite or reasonable time would not be a perpetual burden on the land and would not, therefore, be a conveyance of an interest in the land; and hence, the timber would become personalty. In *France v. Deep River Logging Co., supra,* we said:

"The land and the timber thereon had not been assessed or taxed separately at any time prior to the time of respondents' tax foreclosure, the whole being assessed together as real property. Appellant never requested that the timber upon the land be assessed separately from the land, nor did appellant ever make any return of the timber upon the land as personal property to the assessor of Pacific county, nor did appellant ever pay any taxes thereon in any form; though it did make return of and pay taxes upon personal property owned by it in Pacific county . . .

"Counsel for appellant first contended that respondents' tax deed did not convey to them the title to the timber upon the land, because the timber was constructively severed from the land and became personal property by the conveyance of Dyer to Mooers in 1892. Prior to the act of 1907, Rem. & Bal. Code, § 9095 (P. C. 501, § 23), which became the law long after the assessment and levy of the taxes upon which respondents' foreclosure and deed rests, we had no statute law touching the question of standing timber being real or personal property for purposes of assessment and taxation when separately owned. It is ele-

mentary law that standing timber is real property—as much so as the land on which it stands—when the title to both the timber and the land is vested in one ownership. It may now be regarded as the settled law of this state, in harmony with the decided weight of authority elsewhere, that conveyance of standing timber with the right of entry upon the land and removal of the timber therefrom in the future, whether the time of removal be measured by stated or reasonable time, is within our statute requiring conveyances of real estate or any interest therein to be by deed. . . .

"It is plain, therefore, that the timber here involved was, in any event, real property until conveyed by Dyer to Mooers in 1892, and that its conversion into personal property depends entirely upon the effect of that conveyance. Manifestly, the timber did not become personal property unless it became such by virtue of that conveyance. The conveyance by Mooers to appellant thereafter had no effect upon this question . . .

"The court expressly refrained from determining the question of time limitation against the removal of the timber, as not being involved in the case. A review of that case, we think, renders it plain that the court's decision would have been the same regardless of whether or not the timber became personal property by the conveyance there involved, and that that question was wholly unnecessary to be decided in disposing of the case as the court did. . . .

"A number of decisions of the courts are brought to our notice, holding that standing timber, when sold by the owner of the land, with the right of entry and removal, ceases to be real property and becomes personal property. The decisions so holding, rendered since 1850, to which our attention has been called, upon examination, will be found to involve sales of timber with the right of entry and removal for a fixed, limited period, or cases where such right of entry is subject to be revoked upon notice by the landowner. . . . In *Barber v. Rodgers,* 71 Pa. St. 362, the right of entry and removal was subject to be

revoked upon thirty days' notice. At pages 366, 367, the court observes:

" 'If the agreement does not contemplate the immediate severance of the timber it is a contract for the sale or reservation of an interest in land, and until actual severance the timber in such case passes to the heir, and not to the personal representative. But when the agreement is made with a view to the immediate severance of the timber from the soil, it is regarded as personal property, and passes to the executor and administrator, and not to the heir . . . If the reservation had been made of a perpetual right to enter on the land and cut all the pine and hemlock timber growing thereon, or of a right to cut and take it off at discretion as to time, then it would be within the rule laid down in *Yeakle v. Jacob,* 9 Casey, 376, and *Pattison's Appeal* [61 Pa. St. 294], and be regarded as an interest in land, which would pass to the heir and not to the administrator on the vendor's death.'

"This is a recognition of a distinction between the effect of an agreed immediate removal or upon notice, and an agreement to preserve the right of entry and removal for an unlimited time. Our attention is also called to *Warren v. Leland,* 2 Barb. 613, decided in 1847. That decision, however, and the numerous earlier decisions there reviewed, we regard as of little practical aid to the solution of the question here involved. They furnish but little light touching the nature of such a continuing right of entry upon land and removal of the timber therefrom as is here involved.

"Now, assuming, but not deciding, that a conveyance of standing timber, with the right to enter upon the land and remove it within a stated or reasonable time, such as would be held to mean presently, that is, within such time as would enable the grantee, under ordinary circumstances, to conveniently remove it, having in mind its quantity, and the size of the task of its removal, would have the effect of converting the timber and the right of entry for its removal into personal property, did the grant of this timber, together with the right of entry and removal thereof, made by Dyer to Mooers in 1892, convert the same

into personal property? Recurring to the language of that conveyance, it will be noticed that it gave to Dyer and his assigns 'the right of entering upon said land and removing said timber and trees from the same at the *pleasure* of said grantee, his heirs, personal representatives and assigns . . . to have and to hold the said granted *property and privileges* to the said G. H. Mooers, his heirs, personal representatives, and assigns *forever.'* We italicize the words we regard as controlling here. This language points, we think, conclusively to an intention on the part of the grantor to convey a continuing, perpetual right for all time, to enter upon the land and remove the timber. The grantee's assigns or descendants may do so a hundred years hence. Grants in substance the same as this were held by us to have such effect in *Skamania Boom Co. v. Youmans,* 64 Wash. 94, 116 Pac. 645, and *Healy v. Everett & Cherry Valley Traction Co.,* 78 Wash. 628, 139 Pac. 609. No decision has come to our notice, rendered by any court in this country within the past seventy years, holding that such a grant of standing timber, with right of entry upon the land, converted the property right thereby created into personal property, nor are there any early decisions which we regard as controlling authority here to that effect. Not only is this the meaning of the language of the conveyance; but the acts of all parties concerned point with equal certainty, by their acts and admissions, to this construction by them of the language of the grant; as evidenced by the fact that more than seventeen years elapsed from the making of the grant, when it is claimed that the property was converted into personal property, until it was removed by the grantee's successor, this appellant; that appellant has never returned or listed the timber as personal property; that appellant has never paid any taxes upon the timber in any form, and that appellant has never requested the taxing officers of Pacific county to assess the timber separate from the land. Even if we regarded the question as doubtful, we would resolve such doubt in favor of the view that the timber, for the purpose of taxation, has been, at all times, real property, since, viewed in its physical aspect alone,

it is real property and will be presumed to be such until clearly shown to be otherwise.

"If this property right acquired by Mooers and his grantee, appellant, became personal property by Dyer's conveyance, manifestly, it then ceased to be an interest in real estate, and could thereafter be conveyed otherwise than by deed; interest in real estate being required to be so conveyed by Rem. & Bal. Code, §§ 8745, 8746 (P. C. 143 §§1, 3), leases for less than one year being the only exception, Rem. & Bal. Code, §8802 (P. C. 295, § 1). Is it possible that this property right; to wit, title to the timber with the right of entry and removal, *'to have and to hold the said granted property and privileges . . . forever,'* ceased to be real property by the conveyance of Dyer, containing this language? It is not conceivable to us that this question can be logically answered in the affirmative. The right to the timber was so connected with the continuing right to enter upon the land as to not be severable one from the other, except by the actual physical removal of the timber, thereby putting an end to the right of entry. It may be suggested that possibly the logical classifications of conveyance of standing timber, for the purpose of determining whether the interest so conveyed thereby becomes personal or remains real property, would be to regard the interest conveyed as real property in all cases where the right of entry upon the land is to continue for more than one year. We leave this for future consideration, however, and desire not to be understood as expressing an opinion thereon at this time. We give no consideration to the effect of the law of 1907."

In *McFadden v. Allen-Nelson Mill Co.*, 150 Wash. 249, 272 Pac. 714, we held, with respect to a contract for the sale of timber on a forty-acre tract, granting a right to remove the timber within five years and such longer time as may be needed on payment of ten dollars a year, that "the grantor, in contracting for the sale of the timber, had granted an interest in his land for five years."

In *Heybrook v. Beard,* 75 Wash. 646, 135 Pac. 626,

we held that a contract under which the owner of land sold the standing timber with right of removal within seven years, at the expiration of which time the uncut timber was to revert to the grantor, correctly interpreted, means that the title to the timber passed, subject to a reversion, if the timber had not been cut and removed from the land within the seven-year period.

In *Lehtonen v. Marysville Water & Power Co.*, 50 Wash. 359, 97 Pac. 292, the question presented was whether standing timber reserved upon the sale of real estate reverts to the grantee after the time when the grantor agreed to remove the timber. In that case, the respondent sold the appellant a certain tract of land, but reserved the timber and the right of removal of that timber within two years. After the expiration of the two-year period, the trial court held that the respondent was entitled to a reasonable time thereafter to remove the timber. We said:

"The weight of authority seems to sustain the contention of the appellant that the timber remaining uncut at the expiration of the time fixed by the contract for its removal reverts to the owner of the realty, and becomes a part thereof. Contracts of this character are not uncommon in states producing large quantities of timber, and such states generally hold to the rule stated, . . .

"It is said in Vol. 5, Current Law, p. 1491:

" 'There is an apparent conflict of authority as to whether one purchasing growing timber under a contract limiting the time within which it must be removed loses title to all timber not removed within that time. It would seem, however, that the cases might be reconciled by regarding the question as one of intention to be determined from the terms of the contract itself.'

"See, also, 25 Cyc. 1551; 28 Am. & Eng. Ency. Law (2d ed.), p. 541.

"We think this is the rule which governs this class

of contracts, and which controls this case. Whether the reservation of the timber made it, in legal effect, personal property or otherwise, makes no difference. It is immaterial what the theoretical character becomes. The contract of reservation provides that it shall be removed within a given time. If it was the intention of the parties that the timber might be removed after that time, the limitation means nothing and was misleading. The clear, expressed intention is that the timber shall be removed within the time stated. It follows, of course, that the vendor had no right on the land to sever the timber from the land after the time limit."

By the terms of the mortgage, the growing timber was not expressly or impliedly excepted. It follows, therefore, that the timber constitutes a portion of the realty embraced by a mortgage of the land by Clemons and wife to the appellant. In *France v. Deep River Logging Co., supra,* we said that the statement in *Brodack v. Morsbach,* 38 Wash. 72, 80 Pac. 275, that the timber by the contract of sale became personal property, was dictum, and that the decision in that case would have been the same regardless of whether the timber became personal property by the conveyance there involved, and that the question was not necessary to be decided in the court's disposition of that case. In *France v. Deep River Logging Co., supra,* we held that the timber did not become personal property, but remained a part of the land. In that case, we gave no consideration to chapter 108, § 2, Laws of 1907, p. 206, which provided for assessment under certain conditions of timber separate from the land on which it might be growing as personal property.

In *Perkins v. Bundy,* 42 Idaho 560, 247 Pac. 751, in addressing itself to a similar statute, the supreme court of Idaho said:

"Appellant's contention that such interest is personal property, and that the mortgage is not good as

against him, because not accompanied by the affidavit of good faith required in case of chattel mortgages (C. S., sec. 6375), is based upon C. S., sec. 3102, which defines as personal property for the purpose of taxation, equities in state land; but C. S., sec. 3102, purports only so to classify such equities for the purpose of taxation, and does not change or purport to change the general rule that the interest of a vendee under a contract to purchase land is a mortgageable interest in real estate."

Standing trees are real estate unless they have been sold with the intention of an immediate severance from the soil. It was so held in *Gabbard v. Sheffield,* 179 Ky. 442, 200 S. W. 940, 15 A. L. R. 1.

In *Milwaukee Land Co. v. Poe,* 31 F. (2d) 733, the circuit court of appeals for the 9th circuit held that contracts for a sale of standing timber giving purchaser the right to enter and remove the timber within a stipulated time constituted conveyance of an interest in real estate. It is authority for the position of the appellant that the timber in controversy at the date the mortgage was given was real property. The pertinent portion of the opinion reads as follows:

"The instruments here in question are in form conveyances of standing timber acknowledged and witnessed, but they expressly provide that 'no interest in the land herein described is granted or conveyed by this instrument, other than the right to cut and remove said timber within the time and upon the conditions herein prescribed.' Whether these instruments conveyed interests in land or personalty only is not directly answered by decisions of the courts of either the state of Washington or the state of Idaho. In *Brodack v. Morsbach,* 38 Wash. 72, 80 P. 275, it was held that, whether or not a contract for the sale of growing timber was a sale of an interest in land, the timber nevertheless became personal property upon execution and delivery of the contract, and the only interest the purchaser had or could claim in the land was an implied license to enter and remove the timber.

"In *France v. Deep River Logging Co.,* 79 Wash. 336, 140 P. 361, Ann. Cas. 1916A, 238, the court recognized the distinction between the sale of standing timber with a right to enter and remove it within a fixed period, or within a reasonable time, and the sale of standing timber with the right to enter and remove the same at the pleasure of the grantee, under a deed conveying to him the granted property and privileges forever. In that case the vendor under a deed conveying the 'granted property and privileges forever' sold to the vendee the timber, with the right to enter upon the land and remove it at the vendee's pleasure, and the court held the granted right to be a perpetual right to enter and remove the timber at any time, and that it did not sever the timber from the soil, so as to convert it into personal property.

"The decision did not meet the precise question which is now before this court, but in the course of the opinion that court used language which the majority of the members of this court take as the expression of its view upon the subject when it said: 'It may now be regarded as the settled law of this state, in harmony with the decided weight of authority elsewhere, that conveyance of standing timber, with the right of entry upon the land and removal of the timber therefrom in the future, whether the time of removal be measured by stated or reasonable time, is within our statute requiring conveyances of real estate or any interest therein to be by deed.'

"In view of that utterance of the Supreme Court of Washington, and in view of the fact that by the weight of authority instruments such as those which are here under consideration are held to be conveyances of an interest in real estate, the judgment as to the sales of timber, both in the state of Washington and the state of Idaho, is affirmed."

See, also, *Milwaukee Land Co. v. Poe,* 27 F. (2d) 625.

We are committed to the rule that a conveyance of standing timber, with the right of entry upon the land and removal of the timber therefrom in the future, whether the time of removal be measured by stated or

reasonable time, is the conveyance of an interest in real property.

In *Louisiana Central Lumber Co. v. Womack,* 119 So. (La. App.) 741, the land owner sold certain timber by contract under which the vendee was given twenty years in which to remove the timber. The vendor thereafter mortgaged the land and, subsequent to the date of the mortgage and prior to the expiration of the twenty-year period in which the vendee was permitted to remove the timber under the contract, entered into another contract with the vendee extending the time for the removal of the timber an additional period of three years. The language there used might well be employed in the case at bar. The court said:

"Here a fixed time limit was put upon plaintiff's right to remove the timber by its vendor. If the timber had not been removed within the time limit, it would have reverted to Ellis as the landowner.

" 'Standing timber is property subject to be acquired separately from the land on which it grows, but when sold it must be cut and removed within the period agreed on by the parties or fixed by the court in default of agreement, otherwise it reverts to the owner of the land. . . .' *Ward v. Hayes Ewell Co.,* 155 La. 15, 98 So. 740.

"Ellis, having mortgaged the land, could not thereafter engage the land to the prejudice of the mortgage. And it is immaterial, for this purpose, whether the contract of 1927 was a new sale of the timber or an extension of the twenty years' time allowed to remove it. Either one engaged the land to the prejudice of the mortgage. Manifestly, if Ellis could give three more years' time to remove the timber, he might equally well give twenty more or even fifty and so render the mortgage worthless as a security; for who would pay taxes for fifty years or even twenty years on land for some one else to grow timber on."

In *Williams v. Flood,* 63 Mich. 487, 30 N. W. 93, it was held that:

"If the interest of the vendee in the standing timber would cease at the expiration of the time limited in the contract for its removal, the effect of the extension would be to grant a new or further interest in the land, . . ."

The right of reversion at the date of the mortgage belonged to Clemons and wife as the owners of the land. It was an interest in the land, and, of course, as such, it was subject to mortgage. The mortgage contained no limitation, reservation, or exception; therefore, it covered all interest which the mortgagors had in the land at the time the mortgage was given, and consequently included the right of reversion to the timber.

"A mortgage operates upon whatever interest the mortgagor had and anything the subject of contract or assignment may be mortgaged." *Bonded Building & Loan Ass'n v. Konner,* 113 N. J. Eq. 99, 166 Atl. 79.

In *International Lumber Co. v. Staude,* 144 Minn. 356, 175 N. W. 909, the supreme court of Minnesota held that the grantor in a timber deed, one of the provisions of which was that the grantee should cut and remove the timber within fifteen years from the date of the deed, had a contingent reversionary interest in the timber which he might convey or reserve to himself in a deed of the land subsequently executed.

Where, as in the case at bar, a landowner having sold growing timber on his land with a fixed time for its removal, subsequently mortgages the land, he cannot thereafter, without permission of the mortgagee, extend the time allowed for its removal.

Counsel for respondent contend that, under the doctrine of equitable estoppel, which is applicable in the case at bar, the appellant may not exercise its superior legal right under the mortgage against the respondent. It is urged that, under the following facts,

the elements essential to constitute an equitable estoppel are present:

The appellant, through its officers and agents, had knowledge of all the facts surrounding the title to the timber involved in this controversy from the time of the execution of the original timber deed or bill of sale in 1925. The appellant took the mortgage sought to be foreclosed in this action with full knowledge of respondent's rights; knew of and stood by silent when the extension agreement was obtained by respondent from the Clemons, and allowed respondent to release a portion of the timber and pay taxes on the remaining timber and let the time in the original timber deed expire without logging this land; all of which was done by respondent in reliance upon the extension agreement, appellant being fully aware of the respondent's reasons for so doing.

Respondent cites as sustaining authority for its position and as a leading case on estoppel against a recorded title, *Sumner v. Seaton,* 47 N. J. Eq. 103, 19 Atl. 884. Our attention is directed to *De Boe v. Prentice Packing & Storage Co.,* 172 Wash. 514, 20 P. (2d) 1107, in which appears the following mention of *Sumner v. Seatton:*

"An exhaustive discussion of the principle of estoppel by acquiescence and silence, and review of the authorities thereon is contained in *Sumner v. Seaton,* 47 N. J. Eq. 103, 19 Atl. 884, a decision by the court of chancery of New Jersey. A further discussion of the same question is found in *Swedesboro Loan & Building Assn. v. Gans,* 65 N. J. Eq. 132, 55 Atl. 82, by the same court."

In January, 1925, W. H. France, trustee, as mortgagee, released from mortgage by Clemons and wife all the merchantable timber on the tract of land in controversy to enable Clemons to sell that timber. The trial court found that, when Clemons gave, in 1927,

the mortgage involved in this action, appellant knew, through Mr. France, that Clemons did not own the timber, and that Clemons did not intend to mortgage it; that with this knowledge, appellant included in the mortgage the common law covenants.

It will be presumed that the mortgage speaks the truth. It should also be borne in mind that (Clemons so testified, and that testimony is all the evidence we have on this phase of the case), when the mortgage was given, nothing was said about the timber.

The trial court found that, in 1930, when the Clemons and respondent were negotiating for an extension of the time in which to remove the timber, Clemons, Schafer and Calder discussed the matter with France, who, knowing the timber was included in the mortgage executed by Clemons in 1927 to appellant, did not inform the Schafers of the existence of this mortgage. That respondent and its officers did not know of the mortgage given by Clemons to appellant until the foreclosure suit was instituted. The court found that France, after he concluded in 1932 (two years after the execution of the extension agreement) that the negotiations for the extension agreement mentioned by Calder must have had reference to the timber involved in appellant's mortgage, made no mention of the same to Peter Schafer or Albert Schafer, officers of respondent corporation.

The mortgage was recorded a few days after its execution in 1927 in the office of the county auditor. That recordation constituted notice to the world. The payment by respondent of all personal property taxes assessed against the timber since 1925 was what the respondent was obligated to do under the terms of the original timber contract. France admitted that Calder informed him in 1930 that Clemons asked respondent twenty-five hundred dollars for an extension contract

on some timber, but France did not know it was timber on which appellant had a mortgage. France denied that he had any conversation with Peter Schafer respecting the proposed extension agreement until after the parties had entered into that agreement. He testified that the only conversation he had with Schafer relative to the extension was in the Montesano State Bank in the presence of Mr. Devonshire, about the time the foreclosure suit was commenced.

In 1932, which was two years after the extension agreement—it does not appear that France was informed of the result of the negotiations for the extension agreement—France received a letter from the agent of an oil company seeking mineral rights in the land covered by the mortgage. In this letter, the agent said that there had been a contract in 1925 to sell the timber, but that the contract had expired. It then occurred to France for the first time that the extension contract mentioned by Calder might have had reference to the expired contract.

Schafer testified that, in his conversation with France, no particular land or timber was mentioned; and that there was no reference to the terms of the extension, other than that Clemons wanted too much for an extension. *Schafer further testified that he did not rely on anything said or done by France; that he relied wholly on his own judgment in entering into the extension agreement.*

It is quite probable that, in any conversation he had with France, Clemons would not mention the particular timber involved, in view of the indebtedness of Clemons to the Montesano State Bank and to the appellant. Instinctively, the banker would require of Clemons—this Clemons knew—that any money paid to Clemons for the extension be applied on the mortgage. If Schafer did not know of the existence of the

mortgage—it was of record and he was thereby charged with knowledge—what would be his purpose in discussing with France the matter of extension of the time in which to remove the timber? If it were not for that mortgage, appellant would have no interest in the timber.

When the extension agreement was executed, approximately two years remained of the seven years under the original contract under which respondent could have logged the hemlock timber on the land. Five years of the period given in which to remove the timber had expired at the date of the extension agreement, yet no timber had been removed from the land. Mr. Schafer testified that, during that time, it would not pay to log the timber, which was scattered over several hundred acres of formerly logged-off land. The respondent had seven years in which to log the land—it now prays an additional ten years for that purpose—and it did not do so.

The basis of the trial court's finding of estoppel is the alleged duty of France to inform Peter Schafer of appellant's mortgage, and France's failure to do so.

Clemons' mortgage to appellant was of record in the office of the county auditor when respondent was negotiating with Clemons for an extension of time in which to remove the timber from the land covered by that mortgage. The public record afforded to respondent an available means of information as to appellant's title, and not having taken advantage of it, respondent can not claim an estoppel against appellant, who merely failed to furnish such information.

"And it has been held that he will not be estopped by his silence, although he may know or be informed that others are negotiating for rights and interests in property bound by his title of record, as he is under no obligation to warn or apprise them of that which the record discloses, but there is authority to the con-

trary." [Citing *Sumner v. Seaton,* 47 N. J. Eq. 103, 19 Atl. 884; *Kingman v. Graham,* 51 Wis. 232, 8 N. W. 181, as contrary authority.] 21 C. J. 1130-1131.

The court found that France, after he concluded in 1932 (two years after the execution of the extension agreement) that the negotiations in 1930 for the extension agreement must have had reference to the timber involved in appellant's mortgage, made no mention of same to the Schafers, who did not learn of the mortgage until this action was instituted. That finding is of no materiality; it can have no bearing upon the question under consideration. The conduct relied on to raise the estoppel must have been concurrent with or anterior to the action which they are alleged to have influenced.

An apposite authority is *Peterson v. Bergman Cabinet Mfg. Co.,* 145 Wash. 664, 261 Pac. 381, 55 A. L. R. 989, where we held that a creditor having liens on property of an assignor for the benefit of creditors is not estopped from asserting the liens against a purchaser of the property at an assignor's sale, announced as free from all incumbrance, by his silence at the time of the announcement, where the purchaser had constructive notice of the liens by reason of their due filing for record at the time of the sale. In such a case, there would be no estoppel from the circumstance that the lien claimants worked for the assignee of the insolvent, knew of and discussed the impending sale, and consulted with reference to bidding at the sale. *De Boe v. Prentice Packing & Storage Co.,* 172 Wash. 514, 20 P. (2d) 1107, in which *we adopted only a portion of the language of the opinion in Sumner v. Seaton,* 47 N. J. Eq. 103, 19 Atl. 884, is not out of harmony with *Peterson v. Bergman Cabinet Mfg. Co., supra.*

"The principle of estoppel is well settled. It precludes a person from denying what he has said or the implication from his silence or conduct upon which another has acted. There must, however, be some intended deception in the conduct or declarations, or such gross negligence as to amount to constructive fraud. *Brant v. Virginia Coal & Iron Co.,* 93 U. S. 326; *Hobbs v. McLean,* 117 U. S. 567. And in respect to the title of real property the party claiming to have been influenced by the conduct or declarations must have not only been destitute of knowledge of the true state of the title, but also of any convenient and available means of acquiring knowledge. Where the condition of the title is known to both parties, or both have the same means of ascertaining the truth, there can be no estoppel." *Crary v. Dye,* 208 U. S. 515, 521, 28 S. Ct. 360.

Where a party's rights in property sufficiently appear of record (appellant's mortgage was of record when respondent and Clemons were negotiating for an extension of time to remove the timber from the land involved in this action), mere silence upon his part is no violation of duty, and he is not estopped to assert his rights against others dealing with the property as another's. *Frazee v. Frazee,* 79 Md. 27, 28 Atl. 1105.

"It is a general principle that where one knowingly suffers another, in his presence, to purchase property to which he has a claim of title which he willfully conceals, he will be deemed to have waived his claim and will not thereafter be permitted to assert it against the purchaser. But this rule does not apply where the public records would disclose the ownership of the property. In such a case the purchaser of the property cannot assert against the owner an estoppel founded on his silence and acquiescence." *Lowenberg v. Booth,* 330 Ill. 548, 162 N. E. 191, 195.

There is some authority—not the weight of authority, however—that failure to look up the record will not prevent the application of the doctrine of equitable estoppel:

"Courts of equity have, in many cases, given parties the benefit of an honest supposition as to title where the slightest examination of the record or other equally available source of information would have disclosed their error." *Sumner v. Seaton,* (1890), 47 N. J. Eq. 103, 19 Atl. 884, 887.

None of the facts in the case at bar imposed on W. H. France any duty to inform Mr. Schafer that appellant had a mortgage on the timber, time for the removal of which respondent was seeking to extend, inasmuch as that mortgage was of record; and Schafer relied—he so testified—wholly on his own judgment in entering into the extension agreement. The doctrine of equitable estoppel is not applicable.

"In order to constitute this kind of estoppel there must exist a false representation or concealment of material facts; it must have been made with knowledge, actual or constructive, of the facts; the party to whom it was made must have been without knowledge or the means of knowledge of the real facts; it must have been made with the intention that it should be acted upon; and the party to whom it was made must have relied on or acted upon it to his prejudice. To constitute an 'estoppel in pais' there must concur an admission, statement, or act inconsistent with the claim afterward asserted, action by the other party thereon and injury to such other party. There can be no estoppel if either of these elements are wanting. They are each of equal importance. . . .
"It is an essential element of an equitable estoppel that the acts, representations, or silence relied on to create the estoppel must have been willfully intended to lead the party setting up the estoppel to act upon them, or there must have been reasonable grounds to anticipate that he would change his position or in some way act on the faith of the conduct to his detriment. . . . it is sufficient if the acts, representations, or silence relied on are of such a character as to induce a reasonable and prudent man to believe that they were meant to be acted on. . . . Also estoppel arises

from words or acts, and not from intention alone, and the fact that defendant, who conveyed property to another, who in turn conveyed to defendant's wife, intended the deed to his wife to state that it should be her separate property would not estop him from afterward claiming that he did not intend to give her the property, but merely conveyed it to her to avoid claims of creditors. The intention that a representation or concealment be acted upon as an element of an equitable estoppel may be inferred from circumstances.

"Except in the case of an estoppel affecting the title to land the rule, which in many cases is laid down apparently without qualification, that an estoppel must possess an element of fraud, does not mean that there should be an actual fraudulent intent or design to deceive on the part of the party sought to be estopped, but only that the case should be one in which the circumstances and conduct would render it a fraud for the party to deny what he had previously induced or suffered another to believe and take action upon. However, either actual fraudulent intent or conduct of the character under consideration is essential to create an estoppel. And it has been said that fraud or bad faith is a necessary ingredient of misrepresentation by passivity, although there is authority apparently to the contrary. . . .

"It is an essential element of equitable estoppel that the person invoking it has been influenced by and has relied on the representation or conduct of the person sought to be estopped; and this rule applies with equal force and effect as well where the conduct of the party sought to be estopped consists of silence as where it consists of positive acts. There can be no equitable estoppel where the complainant's act appears to be rather the result of his own will or judgment than the product of what defendant did or represented. . . .

"As a corollary to the proposition that the party setting up an estoppel must have acted in reliance upon the conduct or representations of the party sought to be estopped, it is as a general rule essential that the former should not only have been destitute of knowledge of the real facts as to the matter in con-

troversy, but should have also been without convenient or ready means of acquiring such knowledge. One relying on an estoppel must have exercised such reasonable diligence as the circumstances of the case require. If he conducts himself with a careless indifference to means of information reasonably at hand or ignores highly suspicious circumstances which should warn him of danger or loss he cannot invoke the doctrine of estoppel. . . .

"A public *record is an available means of information as to questions of title, and one who does not take advantage of it cannot claim an estoppel against one who merely fails to furnish such information.* And it has been held that he will not be estopped by his silence, although he may know or be informed that others are negotiating for rights and interests in property bound by his title of record, as he is under no obligation to warn or apprise them of that which the record discloses, but there is authority to the contrary. . . .

"No estoppel arises where the party setting it up is under as great obligation to inform the person sought to be estopped of the real facts as the latter is to inform himself.

"There can be no equitable estoppel short of one arising from actual contract where the truth is known to both parties or where they both have equal means of knowledge.

"Acts done or knowledge acquired subsequent to the transaction out of which the estoppel is claimed to arise can have no bearing upon the question. *The representation or conduct relied on to raise the estoppel must have been concurrent with or anterior to the action which they are alleged to have influenced* . . .

"*It is essential to an equitable estoppel that the person asserting the estoppel shall have done or omitted some act or changed his position in reliance upon the representations or conduct of the person sought to be estopped.*" (Italics ours.) 21 C. J. 1119-1123, 1126, 1128-1133.

The judgment of the trial court in excluding the timber covered by the extension agreement from the foreclosure of appellant's mortgage is reversed.

STEINERT, C. J., BEALS, BLAKE, and GERAGHTY, JJ., concur.