[No. 2229-1.    Division One.    October 28, 1974.]

C. JOSEPH CLARKE, *Appellant*, v. ALSTORES REALTY CORPORA-
TION *et al.*, *Respondents*.
C. JOSEPH CLARKE, *Appellant*, v. AURORA TOWING, INC.,
*Defendant*, ALSTORES REALTY CORPORATION
*et al.*, *Respondents*.

*Dore & Dubuar* and *Albert G. Lirhus* and *Fred H. Dore,* for appellant.

*Shidler, McBroom, Gates & Baldwin* and *George W. Mc-Broom* and *Richard F. Krutch,* for respondents.

FARRIS, J.—C. Joseph Clarke appeals from an adverse judgment of the trial court in a contract dispute.

On April 15, 1966, Harry Schuck, service manager of Northgate Centers, Inc., a wholly owned subsidiary of Al-stores Realty Corporation, sent a memo to Doyle Sims authorizing him to remove peat from certain unimproved real property owned by Northgate. On May 31, 1966, Sims entered into an agreement with C. Joseph Clarke whereby Clarke would remove the peat. The agreement was evidenced by a writing which purported to give Clarke the right (1) of entry for 2 years to remove peat, (2) to stockpile peat on the property and (3) to hold unencumbered title to the peat. Clarke paid Sims $10,500 in return and promised to drain a pond on the property which was a possible source of liability to Northgate.

Clarke engaged an attorney to handle the arrangements. The attorney telephoned Schuck to verify Sims' authority to bind Northgate to the sale and removal of the peat and was assured Sims possessed such authority. He thereafter sent a certified copy of the Sims-Clarke contract to Schuck with a cover letter. The contract price was omitted, but the 2-year removal provision was included. No response was made to the letter, but the record reflects that Schuck discussed the 2-year removal provision with James Douglas, president of Northgate. The record indicates that Douglas instructed Schuck that the 2-year term would be subject to a 6-month cancellation clause. Schuck asserts that he immediately notified Sims of that limitation. Sims denies that the notice was given. It is undisputed that no one notified Clarke, who expended approximately $20,000 of his

own funds, plus an additional sum which he borrowed, in furtherance of the contract.

On October 24, 1966, Northgate wrote a letter to Clarke in which it gave Clarke 6-months' notice to vacate the premises and also acknowledged the existence of Clarke's contract for the removal and stockpiling of peat. Clarke treated the notice as a unilateral attempt to modify a written agreement and refused to vacate. Northgate thereafter employed Aurora Towing to physically remove Clarke and his equipment from the premises. At that time Clarke had already removed 1,600 cubic yards of peat and had stockpiled an additional 24,000 cubic yards of peat on the property, pursuant to the contract. Whether Clarke had also drained the pond as required by the contract is disputed.

Clarke brought action for breach of contract, misrepresentation and conversion of the 24,000 cubic yards of peat. Both sides moved for summary judgment. The trial court granted Northgate's motion, but denied Clarke's.

The trial court agreed with Northgate's argument that RCW 64.04.010 (the statute of frauds) was a defense to the action. The court was persuaded that the sale of peat in place is a sale of an interest in realty. Clarke does not dispute that the written contract upon which he relies was not acknowledged, lacked a full and complete legal description of the parcel and was not executed by Northgate or an authorized agent of Northgate. He argues instead that his partial performance was sufficient to take the contract outside of the statute of frauds and, in any event, the 24,000 cubic yards of peat was personal property to which he had title and therefore his action for conversion of that peat should lie.

■ Although no Washington case has been brought to our attention which characterizes the sale of peat in place as the sale of an interest in realty, we agree with the trial court's ruling on the point.[1] The peat grew naturally upon

---

[1] Since it was not raised by the parties, we reserve judgment on the issue of whether the granting of summary judgment was proper where a potential issue of fact is presented by the possible characterization of

the land, unaided by human efforts. At common law, vegetation which grew from perennial roots without the aid of human care and cultivation was regarded as "fructus naturales," and, while unsevered from the soil, was considered as pertaining to realty. *Severe v. Gooding*, 43 Idaho 755, 254 P. 1054 (1927) (wild grass and herbage); *Webb v. Arrington*, 249 Md. 46, 238 A.2d 243 (1968) (sod) (*compare Barron v. Edwards*, 45 Mich. App. 210, 206 N.W.2d 508, 509-10 (1973) (cultivated sod, grown as a crop, treated as personalty)); *Kirkeby v. Erickson*, 90 Minn. 299, 96 N.W. 705, 706 (1903) (wild grass); *Sparrow v. Pond*, 49 Minn. 412, 52 N.W. 36 (1892) (blackberries); *In re Chamberlain*, 140 N.Y. 390, 35 N.E. 602 (1893) (grass).

RCW 62A.2-107(1) now defines the test for determining the real or personal character of "timber, minerals or the like" but did not become effective until after the date of the contract now before the court. The common-law standard for characterization is therefore controlling. Washington cases, on analogous issues, are consistent with the trial court's ruling. *See Coleman v. Layman*, 41 Wn.2d 753, 756, 252 P.2d 244 (1953); *Elmonte Inv. Co. v. Schafer Bros. Logging Co.*, 192 Wash. 1, 72 P.2d 311 (1937).

A contract to convey real property must satisfy the requirements of the statute of frauds; whether there was sufficient part performance to take the contract in question outside of the statute, however, is not capable of determination as a matter of law upon the record before us. Both sides agree that *Miller v. McCamish*, 78 Wn.2d 821, 828-29, 479 P.2d 919 (1971) controls the issue.

> As evidenced by the test required in this state to successfully assert part performance, the court's overriding concern *is precisely directed toward and concerned with a quantum of proof certain enough to remove doubts as to the parties' oral agreement:*
>> The first requirement of the doctrine that part performance of an oral contract exempts it from the pro-

the transaction as either a personal service or a sales contract. *See Dobson v. Masonite Corp.*, 359 F.2d 921 (5th Cir. 1966); *Stagner v. Staples*, 427 S.W.2d 763 (Mo. App. 1968).

visions of the statute of frauds is that the contract be proven by evidence that is clear and unequivocal and which leaves no doubt as to the terms, character, and existence of the contract. . . .

A mere preponderance of the evidence is not sufficient. If the evidence leaves it at all doubtful as to whether or not a contract was entered into, the court will not decree specific performance.

. . .

Another requirement of the doctrine . . . is that the acts relied upon as constituting part performance must unmistakably point to the existence of the claimed agreement. If they point to some other relationship, such as that of landlord and tenant, or may be accounted for on some other hypothesis, they are not sufficient.

(Citations omitted.) *Granquist v. McKean,* 29 Wn.2d 440, 445, 187 P.2d 623 (1947).

Thus, in determining whether sufficient part performance has taken place here, we are not so much interested in the amount of actual effort expended by Clarke as we are in whether that effort circumstantially establishes all of the elements of the contract. Such an inquiry best furthers the legislative intent of RCW 64.04.010, *i.e.,* preventing fraud. *Miller v. McCamish, supra* at 828.

Northgate argues that Clarke's activities do not "unequivocally" point to the 2-year right of entry allegedly contained in the contract because the actions also support Northgate's theory that the contract was subject to a 6-month right of cancellation. If that argument is accepted, part performance as a defense would be rendered nugatory wherever there is a dispute in the contract as to the amount of time agreed to for full performance. Performance, being partial, depends, by definition, on the occurrence of future events for completion. The contract term is thus incapable of "unmistakable" definition by any degree of performance other than full performance. That fact, however, is not sufficient to defeat the contract. The writing provided for a 2-year removal time and the part performance here is not inconsistent with that provision. Fur-

ther, it is undisputed that Clarke was never informed of the 6-month cancellation clause.

■ Further, on appeal from the trial court's granting of defendant Northgate's motion for summary judgment, the court is required to consider all facts and inferences in a light most favorable to Clarke as the nonmoving party. *Hudesman v. Foley,* 73 Wn.2d 880, 441 P.2d 532 (1968); *Balise v. Underwood,* 62 Wn.2d 195, 381 P.2d 966 (1963). Clarke was not near completion of the project at the end of the first year. The "favorable inference" that we are required to draw from this is that Clarke anticipated another summer on the project to complete the job. This sufficiently supports Clarke's version of the contract for the purposes of prima facie establishing part performance in resisting the motion for summary judgment.

Northgate also argues that even if an issue of fact may exist as to whether Clarke partially performed the contract, the contracting parties were Sims, an "interloper," and Clarke, and therefore any contract that may be proved between the parties to it would not be binding upon Northgate. The record precludes the adoption of this position on Northgate's motion for summary judgment.

Clarke placed the following before the court:

1. An authorization from "service manager" Harry Schuck to Doyle Sims to remove the peat in question, written under the Northgate letterhead.

2. A telephone verification given to Clarke's attorney by Schuck of Sims' right to dispose of the peat.

3. The fact that a copy of the contract was sent to Northgate immediately following the Clarke-Sims negotiations.

4. A letter from Northgate to Clarke admitting that there was a contract and recognizing Clarke's rights thereunder.

5. The fact that, with Northgate's full knowledge, Clarke did work and expended money in furtherance of the contract.

6. Sims' denial that he was notified of Northgate's right to terminate upon giving 6-months' notice.

Viewing these facts and inferences therefrom in a light most favorable to Clarke, we cannot rule as a matter of law that Sims is an "interloper," that the Sims-Clarke contract is not binding upon Northgate and that Northgate did not therefore have an obligation to communicate the 6-month cancellation clause directly to Clarke. These are factual questions, material to the outcome of the litigation and thus not properly resolved on a motion for summary judgment. *State ex rel. Bond v. State*, 62 Wn.2d 487, 383 P.2d 288 (1963).

Reversed.

JAMES and CALLOW, JJ., concur.