[No. 8079–2–I.   Division One.   May 12, 1980.]

DOWNTOWN TRAFFIC PLANNING COMMITTEE, ET AL, *Appellants,* v. CHARLES ROYER, ET AL, *Respondents.*

*Roger M. Leed,* for appellants.

*Gordon F. Crandall* and *Robert L. Gunter,* for respondents. .

Swanson, J.—The Downtown Traffic Planning Committee (Committee), a voluntary association, and its members

as individuals appeal from an order dismissing with prejudice their complaint for injunctive and declaratory relief. The Committee had filed suit against the mayor and city engineer of the City of Seattle (City) to forestall implementation of exclusive bus lanes in downtown Seattle until after the City had completed the environmental impact statement (EIS) process specified in the State Environmental Policy Act of 1971 (SEPA), RCW 43.21C. The sole issue on appeal is whether as a matter of law WAC 197–10–170(1) categorically exempts the bus–lane program from compliance with SEPA. We hold it does not and, accordingly, reverse.

The procedural history of this case is somewhat complex. On July 31, 1978, the Seattle City Council passed a resolution approving an exclusive bus–lane program for downtown Seattle. The Committee filed its complaint on August 12, 1978, and moved for a temporary restraining order and preliminary injunction against the program. The trial court denied the motion for a temporary restraining order and the bus lanes began operation on August 14, 1978. After hearing 3 days of testimony and considering affidavits and exhibits submitted by both sides, the court then denied the motion for temporary injunction. The court ruled in denying the motion that WAC 197–10–170(1)[1] exempted the program from SEPA compliance. The court's order included no findings of fact. The Committee sought and was denied discretionary review of this ruling in the state Supreme Court. The City then filed its answer to the Committee's complaint. In its prayer, the City requested the complaint be dismissed with prejudice. The next document in the record is an order entered by the trial court dismissing the Committee's complaint with prejudice. The court stated in this order that it had concluded "as a matter of

---

[1]The trial court's orders denying the motion for temporary injunction and dismissing the complaint incorrectly cited this regulation as "WAC 197–10–070(1)," a nonexistent section. The context of the citations indicates the court meant to cite WAC 197–10–170(1), the regulation governing "minor new construction."

law" that the bus–lane program "is categorically exempt under [WAC 197–10–170(1)] from the threshold decision and EIS provisions of the State Environmental Policy Act, which determination resolves all other issues presented by this suit." The Committee appealed dismissal of its complaint to the Supreme Court, which transferred the case to this court. The Committee on appeal has withdrawn its request for an injunction and limits its prayer for relief to a ruling that the City complete an EIS on the bus–lane program and on any further transit proposals to which the program is linked. The Municipality of Metropolitan Seattle (Metro), a municipal corporation that provides bus transportation for King County, intervened as a party in the trial court and joins the City as an additional respondent in this appeal.

The bus–lane program at issue in this appeal operates in downtown Seattle on weekdays from 7 to 9 a.m. and 4 to 6 p.m. During those hours, the City limits traffic in the right–hand curb lanes of Second and Fourth Avenues to Metro buses and vehicles making right turns. No other vehicles may drive, park, or stop in the right–hand curb lanes of these streets while the bus lanes are in operation. Prior to establishment of these bus lanes, all lanes of Second and Fourth Avenues were open to buses and other vehicles alike at all times of the day. In its resolution approving the bus–lane program, the City Council authorized the following changes on Second and Fourth Avenues: the lengthening and relocation of existing bus loading zones, the establishment of a new bus loading zone, the modification or relocation of truck loading zones, the adjustment of traffic signals, and the revision of lane markings and signs.

The City put its bus–lane program into operation without completing an environmental impact statement and without making a "threshold determination," based on an evaluation of the likely environmental effects of the program, that preparation of an EIS was unnecessary. The City claims it was excused from both the EIS and threshold

determination requirements of SEPA by WAC 197–10–170(1).

SEPA requires an environmental impact statement to be included "in every recommendation or report on proposals for legislation and other major actions significantly affecting the quality of the environment, . . ." RCW 43.21C.030(2)(c). If a governmental agency makes the "threshold determination" that a proposal will not have significant environmental effect and, hence, does not require an impact statement, it must demonstrate that it considered relevant environmental factors before reaching that decision. *Lassila v. Wenatchee,* 89 Wn.2d 804, 576 P.2d 54 (1978).

Apparently to assist agencies in interpreting these requirements, the legislature directed the Council on Environmental Policy to promulgate guidelines specifying "[c]ategories of governmental actions which normally are to be considered as potential major actions significantly affecting the quality of the environment [thus requiring an EIS] as well as categories of actions exempt from such classification, . . ." RCW 43.21C.110(1)(a). These guidelines are set out in WAC 197–10–170 under the heading "Categorical exemptions." The exemptions include a long list of activities which the guidelines state "are not major actions, and proposals for such activities are exempted from the threshold determination and EIS requirements of SEPA . . ." WAC 197–10–170.

WAC 197–10–170(1), the subsection of these guidelines disputed in this appeal, provides in pertinent part as follows:

(1) Minor new construction. The following types of construction shall be exempt except when undertaken wholly or in part on lands covered by water; the exemptions provided by this subsection apply to all licenses required to undertake the construction in question, except when a rezone or any license governing emissions to the air or water is required:

. . .

(d) The construction or designation of bus stops, loading zones, shelters, access facilities and pull–out lanes for taxicabs, transit and school vehicles.

(e) The construction and/or installation of commercial on–premise signs, and public signs and signals.

(f) The construction or installation of minor road and street improvements such as pavement marking, . . . widening of a highway by less than a single lane width where capacity is not significantly increased and no new right of way is required, adding auxiliary lanes for localized purposes, (weaving, climbing, speed change, etc), where capacity is not significantly increased and no new right of way is required, channelization and elimination of sight restrictions at intersections, street lighting, guardrail and barricade installation, installation of catch basins and culverts, and reconstruction of existing road bed (existing curb to curb in urban locations), including adding or widening of shoulders, addition of bicycle lanes, paths and facilities, and pedestrian walks and paths, but not including additional automobile lanes.

In ruling as a matter of law that this regulation exempted the bus–lane program from SEPA's EIS and threshold determination requirements, the trial court apparently concluded that the physical changes made to implement the bus lanes—alterations in bus and loading zones, lane markings, sign and signal changes, etc.—were sufficient to place the program within the regulation's coverage. The City and Metro on appeal argue that this interpretation is correct.

The Committee disagrees with this interpretation of the regulation. It argues that the bus–lane program is not within the categorical exemptions of WAC 197–10–170(1) because the program has had ramifications beyond those created normally by changes in street signs and loading zones. As evidence of these ramifications, the Committee presented to the trial court the oral testimony of witnesses and a variety of affidavits and exhibits. Operators of businesses on Second and Fourth Avenues alleged the bus–lane program harmed them economically by restricting access by customers and suppliers. Operators of taxicab and produce supply companies which service the affected avenues also

claimed the bus lanes harmed their businesses. A former architect for the City alleged the re–marking of the avenues for the bus lanes eliminated one lane of traffic, increasing congestion and potentially increasing air pollution and noise. The former director of the City's Department of Community Development alleged the bus–lane program would "deaden" the streets and drive away shoppers and other pedestrians. The Committee also presented evidence to the trial court tending to show that the current bus lanes were part of a greater program of transit modifications planned by the City and Metro. The Committee alleged the City artificially separated its current bus–lane program from its larger plans to avoid SEPA compliance.[2]

■ Although the City and Metro dispute the Committee's allegations, we are constrained on review to accept these allegations as true. The trial court entered its order of dismissal based on a conclusion of law reached after considering the pleadings, testimony, affidavits, and exhibits of the parties. The Committee and the City at oral argument concurred that this ruling should be construed as a ruling

---

[2]Both sides agree that in 1975 the City and Metro proposed a bus–lane plan for downtown Seattle consisting of two phases: (1) initial installation of single bus lanes on Second and Fourth Avenues running with the flow of other traffic ("with–flow" lanes) and (2) subsequent installation of two bus lanes on each of these avenues running against the flow of other traffic ("contraflow" lanes). The City legal department determined that this proposal was a "major action significantly affecting the quality of the environment" and, under SEPA, required preparation of an EIS. In 1976, the City prepared a draft EIS on the proposal but following adverse public reaction decided not to implement the plan.

The Committee alleges that in 1978 the City and Metro revived a version of this plan. The Committee introduced into evidence in the trial court a proposed City Council resolution that would have instituted with–flow bus lanes and committed the City to further transit modifications including, possibly, contraflow lanes, if the with–flow lanes did not enable Metro buses to meet specified performance standards.

The Committee also introduced into evidence an opinion from the City Attorney that implementation of with–flow lanes constituted "minor new construction" and fell within the exemptions of WAC 197–10–170 but that the further proposed modifications were "major actions" and could not be implemented without an EIS. The Committee contends that this opinion induced the City officially to approve only the with–flow phase of its plan but that the City remains committed to further transit modifications.

on a motion for summary judgment, a contention that Metro did not dispute. This interpretation appears proper. The impetus for the trial court's dismissal of the complaint does not appear in the record. The trial court may have been acting in response to the City's prayer for dismissal in its answer. If so, the court may have construed this prayer as a motion for judgment on the pleadings or a motion to dismiss for failure to state a claim upon which relief could be granted. In either case, because the court considered matters outside the pleadings in dismissing the complaint, the Superior Court Civil Rules require the ruling to be treated as a ruling on a motion for summary judgment. CR 12(b), (c). A trial court in granting a motion for summary judgment rules that pleadings, depositions, admissions on file, and affidavits show that no genuine issue exists as to any material fact and that the moving party is entitled to a judgment as a matter of law. CR 56(c). In reviewing the granting of a motion for summary judgment, an appellate court must consider all facts and inferences from those facts in a light most favorable to the appellant. *Clarke v. Alstores Realty Corp.,* 11 Wn. App. 942, 527 P.2d 698 (1974). An appellate court may affirm the judgment only if reasonable persons could reach but one conclusion from the evidence: that no genuine issue of material fact exists. *Jewett–Gorrie Ins. Agency, Inc. v. Visser,* 12 Wn. App. 707, 531 P.2d 817 (1975).

We are reversing the trial court here because a genuine issue of material fact exists. A "material fact" is a fact upon which, in whole or in part, the outcome of the litigation depends. *Barber v. Bankers Life & Cas. Co.,* 81 Wn.2d 140, 500 P.2d 88 (1972). Genuine issues of material fact exist here because the parties disagree on the effects of the bus–lane program and on the program's relationship to further planned transit projects. These facts are crucial to the outcome of this case and, therefore, material because resolution of these issues will determine whether the program is exempt from SEPA compliance.

The Committee alleges a set of facts that, if true, mean the bus–lane program may be a major action significantly affecting the quality of the environment, hence requiring preparation of an EIS. RCW 43.21C.030(2)(c). The Committee claims the bus lanes will increase congestion, noise, and air pollution and "deaden" the streets. Air quality, noise, transportation, and aesthetics are all elements of the "environment" to be considered by agencies contemplating a program or project. WAC 197–10–444. If the Committee's allegations are correct, the bus lanes may well have a significant effect on the environment. The Committee further alleges that the bus–lane program is the first phase of a larger scheme of transit modifications that would have an even greater impact on the downtown environment. SEPA requires preparation of an EIS prior to governmental authorization of the first of a series of projects which, considered cumulatively, constitute a major action significantly affecting the quality of the environment. *Juanita Bay Valley Community Ass'n v. Kirkland,* 9 Wn. App. 59, 510 P.2d 1140 (1973). Therefore, even if the current bus–lane program would otherwise be exempt from SEPA compliance, its linkage to a larger plan might make an EIS mandatory.

If the Committee's allegations are true, the bus–lane program is not categorically exempt from SEPA compliance under WAC 197–10–170(1). The activities exempted in this regulation are minor, routine acts usually having negligible environmental impact. The bus–lane program, as described by the Committee, however, appears to have widespread and significant effects on the environment. We recognize that the categorical exemptions of which this regulation is a part were intended to provide guidance to governmental agencies in determining when a proposal requires SEPA compliance. WAC 197–10–020(2). The legislature, however, cannot have intended for these exemptions to provide the final determination of when a proposed project, regardless of its environmental impact, must comply with SEPA. To interpret this regulation as a matter of

law to exempt the bus–lane program, with its allegedly severe effect on the environment, would be to interpret it to permit an action prohibited by SEPA. A regulation that goes beyond the scope of, or conflicts with, its statutory authority is invalid. *Pacific Northwest Bell Tel. Co. v. United States,* 378 F. Supp. 297 (W.D. Wash. 1974), *rev'd on other grounds,* 549 F.2d 1313 (9th Cir.), *cert. denied,* 434 U.S. 820, 54 L. Ed. 2d 76, 98 S. Ct. 62 (1977). An administrative regulation should be interpreted so that it is not void, particularly where, as here, it is adopted pursuant to express statutory authorization. *Hayes v. Yount,* 87 Wn.2d 280, 552 P.2d 1038 (1976). Therefore, agencies applying the categorical exemptions in WAC 197–10–170 must consider the likely environmental effects of a proposal to determine whether it is the type of routine activity to which the legislature intended these exemptions to apply. WAC 197–10–170(1) may indeed exempt this program from SEPA compliance if the program's effects and relationship to the City's future transit plans do not make it a "major action significantly affecting the quality of the environment." For the considerations stated above, however, we hold that WAC 197–10–170(1) does not as a matter of law exempt the City's bus–lane program from SEPA compliance.

Order of dismissal reversed; remanded for trial. The Committee's relief, if it prevails at trial, shall be limited to a ruling that the City must comply with SEPA's EIS and threshold determination requirements for the current bus–lane program and for such further transit projects of which the bus–lane program is a part.

CALLOW, C.J., and DORE, J., concur.

Reconsideration denied July 16, 1980.