995 P.2d 63 (2000)
140 Wash.2d 200
Linda J. KUCERA, Donald W. Green, Jackie A. Rossworn, and Nancy Leonard, individually and on behalf of all others similarly situated, Respondents,
v.
The STATE of Washington, DEPARTMENT OF TRANSPORTATION, and the Washington State Ferries, Petitioners.
No. 68428-6.
Supreme Court of Washington, En Banc.
Argued January 25, 2000.
Decided March 16, 2000.
*65 Galen George Schuler, Seattle, Amicus Curiae on Behalf of Citizens for Reliable and Fair Trans.
Kent C. Meyer, Seattle, Amicus Curiae on Behalf of Kitsap Transit Authority.
Foster, Pepper & Shefelman, Richard L. Settle, Seattle, Amicus Curiae on Behalf of Passenger Vessel Association.
Brent David Lloyd, Seattle, Amicus Curiae on Behalf of Washington Environmental Council.
Glenna Malanca, Knute Rife, Asst. City Atty's, Bremerton, Christine Gregoire, Atty. Gen., William Williams, Heidi Irvin, Asst. Atty's Gen., Olympia, Russell Hauge, Kitsap County Prosecutor, Jacquelyn Aufderheide, Shelley Kneip, Deputies, Port Orchard, for Petitioners.
Steve Berman, Sean Matt, Andrew Volk, Seattle, for Respondents.
*64 SANDERS, J.
Petitioners Department of Transportation, Washington State Ferries, Kitsap County, and the City of Bremerton seek relief from a preliminary injunction limiting the speed of a passenger ferry, the Chinook, along a portion of its run pending compliance with the State Environmental Policy Act of 1971 (SEPA), chapter 43.21C RCW. We granted petitioners' motion for direct discretionary review to consider whether the trial court properly granted injunctive relief pending compliance with SEPA.
We hold the trial court improperly disregarded the established prerequisites for issuance of a preliminary injunction by granting such relief without finding (1) the property owners have an inadequate remedy at law, and (2) the high-speed operation of the Chinook causes actual, substantial, and irreparable injury to the shoreline or the environment. In addition to these errors, the trial court erroneously refused to balance the relative interests of the parties and the general public. Accordingly, we dissolve the trial court's preliminary injunction slowing the Chinook.

FACTS
The Washington State Department of Transportation (DOT), through Washington State Ferries (WSF), operates passenger and automobile ferries throughout the Puget Sound and has been doing so since it acquired the former Puget Sound Navigation Company in 1951.[1]
The Bremerton-Seattle route is part of State Route 304 and is served by both automobile and passenger-only ferries. RCW 47.17.556. On the route, ferries transit Rich Passage, a narrow one-mile long passage between *66 the Kitsap Peninsula and the southern tip of Bainbridge Island.
Bremerton was served throughout the 1970s by 160-car, 2,500-passenger ferries of the Super Class. These vessels, with v-shaped hulls and very high length-to-beam ratio, could, despite their size, transit Rich Passage at 18 knots without an objectionable wake. In the 1980s, the introduction of the Issaquah-Class ferries, with a lower length-to-beam ratio, led to the first complaints from property owners along the shores of Rich Passage. Consequently, these vessels were slowed for the one-mile portion of the narrow Rich Passage.
When WSF instituted passenger-only service along the Bremerton-Seattle route with the Tyee, complaints increased and this vessel was slowed through Rich Passage. In 1990, WSF deployed two single-hulled vessels, the Skagit and Kalama. At their respective speeds of 25 and 27 knots, these single-hulled vessels generated very high wake wash, which caused increased complaints from residents at new locations outside the narrow choke point of Rich Passage. In response to these complaints, WSF voluntarily slowed these vessels to 11 knots from the start of Rich Passage all the way to Bremerton, a distance of 5.2 nautical miles.[2]
WSF then commissioned a study to determine whether the high-speed operations had caused any damage to the Rich Passage shoreline and what could be anticipated if the vessels continued to operate at the slower speeds. The study concluded the shoreline had not suffered significant damage, but noted that long term high-speed operation of those specific vessels could be problematic. The study also concluded the wake wash of the two vessels traveling at 11 knots would have a negligible effect on the shoreline. The WSF engineering staff used this conclusion to develop a wake wash performance standard for new vessels designed to provide high-speed passenger service along the route. The wave energy produced by the Skagit and Kalama at 11 knots was measured and utilized to create a wave energy standard that was ultimately incorporated into the contracting process for the acquisition of the Chinook.
WSF acquired the Chinook through a legislatively authorized design-build contract. With a twin-hulled catamaran design, the Chinook was designed to meet the wake wash ("no-harm")[3] standard developed by WSF to attain the self-imposed goal of making vessel operation relatively imperceptible on the Rich Passage shoreline.
In May 1998 WSF commenced operation of the Chinook to provide high-speed passenger service on the Bremerton-Seattle ferry route. The Chinook is the first of two passenger-only ferries acquired by WSF to provide high-speed passenger service along the Bremerton-Seattle route. The vessel has a 34-knot service speed, allowing a crossing time of approximately 30 minutes, a considerable improvement over existing vessels. In addition, the faster crossing time allows for more frequent departure times. A sister ship, the Snohomish, was scheduled to begin service in September 1999.
Early results indicated the Chinook was an immediate success with ferry commuters. In the first three quarters of operation, passenger travel on the Bremerton-Seattle route increased by 210%, 182%, and 156%, respectively, as compared with the same periods the previous year. Simultaneously, the number of automobiles on the Bremerton-Seattle route decreased, even though total ridership continued to increase.
However not long after the Chinook began operating, a number of property owners along Rich Passage again complained that the wake from the vessel was damaging the shoreline in front of their homes. On April *67 22, 1999, property owners instituted the present class action lawsuit against the State seeking monetary damages and injunctive relief for inverse condemnation and violation of the Shoreline Management Act of 1971 (SMA), chapter 90.58 RCW.[4] Later, the property owners filed an amended complaint for declaratory and injunctive relief and damages, adding causes of action for trespass, negligence, nuisance, and violation of SEPA.
On May 19, 1999, the property owners moved for a preliminary injunction, requesting the court to order WSF to slow the Chinook while transiting Rich Passage. The property owners relied on their trespass, negligence, nuisance, SMA, and SEPA claims to justify the preliminary relief sought. The State vigorously objected to the request for a preliminary injunction, arguing that deployment and operation of a vessel along an established ferry route is not an "action" as that term is defined in WAC 197-11-704 for purposes of SEPA. The State also asked the court to balance the equities and competing interests of the parties before granting even a temporary injunction.
The trial court conducted an evidentiary hearing on the motion for preliminary injunction on July 13-15 and July 20, 1999. Both parties submitted voluminous evidence on the issue of whether alleged changes to the shoreline of Rich Passage were the result of the operation the Chinook, as contended by the property owners, or resulted from other causes.
In its order granting a preliminary injunction, the trial court concluded "the requirements of SEPA clearly apply to the deployment and operation of the Chinook in the wave impact area." Clerk's Papers (CP) at 2644. Although the court found "[i]t is undisputed that significant erosion has occurred to certain properties in the wave impact area since the introduction of the Chinook," CP at 2643, the court declined to find the operation of the Chinook in fact caused these changes to the shoreline along Rich Passage. Nevertheless, the court found "[t]he introduction of high-speed ferry operations in Rich Passage had at least the potential for affecting the environment," CP at 2642, and thus concluded the State violated SEPA as no formal and public environmental analysis was done prior to the commencement of the Chinook's operations in the wave impact area. The trial court also reasoned:
Although at this time it is not entirely clear to the Court at which point the Washington State Ferry System should have made a threshold determination, nevertheless the Court holds that SEPA clearly applies to the Ferry System's placing the Chinook in service for high-speed operations.
CP at 2646-47.
The trial court rejected the argument that, in deciding whether to issue a preliminary injunction, it should consider whether the property owners had an adequate remedy at law and balance the competing interests of the property owners with those of the general public. Instead, the court reasoned:
[B]oth the caselaw and the policy underlying the Act strongly suggest that a total failure to follow the minimum requirements of SEPA in an environmentally sensitive area does not require further proof of harm or a balancing of interests.
CP at 2647. Accordingly, the trial court granted the property owners' motion for a preliminary injunction and ordered the Chinook slowed to 12 knots or less through the "wave impact area"[5] pending full compliance with SEPA.
On August 13, 1999, the court issued its order regarding the preliminary injunction bond, requiring the property owners to post a bond of $10,000. In its memorandum opinion, the trial court concluded the State failed to present significant evidence of potential economic damages it would be likely to suffer from a wrongful injunction and reasoned, *68 "the court is unlikely to learn facts at trial that might convince it that SEPA does not apply, and does not consider the cost of complying with state law an element of damage." CP at 2639.
While the bond issue was pending, Kitsap County and the City of Bremerton were allowed to intervene to contest the injunction. The defendants then moved for reconsideration and for a stay of the injunction pending appellate review. On August 30, 1999, the court denied these motions. At the same time, however, the court entered an agreed order supplementing the injunction. Specifically, the court (1) ordered the State to immediately begin SEPA review, (2) directed the County to convene an advisory committee consisting of waterfront property owners, ferry commuters, business representatives, an expert in hydrodynamics or oceanographic design, a shoreline biologist, and representatives of local and state agencies, (3) directed the parties to explore alternatives to the current situation, including various ways of reducing wake energy or the potential impact of wake energy from the boats, with the goal of implementing an alternative within six months, and (4) ordered the parties to submit a progress report regarding the SEPA review and the implementation of alternatives by November 15, 1999.
On August 23, 1999, the State and Kitsap County moved this court for an emergency stay of the injunction pending this court's decision whether to grant discretionary review, which we denied. Subsequently, the State, Kitsap County, and the City of Bremerton moved for direct discretionary review and requested accelerated review. We granted petitioners' motions for discretionary review on November 3, 1999.

Preliminary Injunction
We granted petitioners' motion for direct discretionary review to consider whether the trial court properly granted an injunction slowing the Chinook pending compliance with SEPA. Although the trial court declined to find the operation of the Chinook in fact caused erosion to the shoreline along Rich Passage, it granted the requested preliminary relief, reasoning: "both the caselaw and the policy underlying the Act strongly suggest that a total failure to follow the minimum requirements of SEPA in an environmentally sensitive area does not require further proof of harm or a balancing of interests." CP at 2647.
A trial court's decision to grant an injunction and its decision regarding the terms of the injunction are reviewed for abuse of discretion. Washington Fed'n of State Employees v. State, 99 Wash.2d 878, 887, 665 P.2d 1337 (1983). A trial court necessarily abuses its discretion if the decision is based upon untenable grounds, or the decision is manifestly unreasonable or arbitrary. Id.
An injunction is distinctly an equitable remedy and is "frequently termed `the strong arm of equity,' or a `transcendent or extraordinary remedy,' and is a remedy which should not be lightly indulged in, but should be used sparingly and only in a clear and plain case." 42 Am.Jur.2d Injunctions § 2, at 728 (1969) (footnotes omitted). Accordingly, injunctive relief will not be granted where there is a plain, complete, speedy and adequate remedy at law. State v. Ralph Williams' N.W. Chrysler Plymouth, Inc., 87 Wash.2d 298, 312, 553 P.2d 423 (1976).
The applicable requirements for issuance of a preliminary injunction are well settled:
"[O]ne who seeks relief by temporary or permanent injunction must show (1) that he has a clear legal or equitable right, (2) that he has a well-grounded fear of immediate invasion of that right, and (3) that the acts complained of are either resulting in or will result in actual and substantial injury to him."
. . . .
[S]ince injunctions are addressed to the equitable powers of the court, the listed criteria must be examined in light of equity including balancing the relative interests of the parties and, if appropriate, the interests of the public.
Tyler Pipe Indus., Inc. v. Department of Revenue, 96 Wash.2d 785, 792, 638 P.2d 1213 (1982) (quoting Port of Seattle v. International Longshoremen's & Warehousemen's *69 Union, 52 Wash.2d 317, 319, 324 P.2d 1099 (1958)); see also RCW 7.40.020 (grounds for issuance of preliminary injunction).[6] If a party seeking a preliminary injunction fails to establish any one of these requirements, the requested relief must be denied. Washington Fed'n, 99 Wash.2d at 888, 665 P.2d 1337.
A. Inadequate Legal Remedy
In their motion for a preliminary injunction, the property owners argued "[t]he continued elimination of shellfish and other marine life on the shoreline is irreparable," CP at 66, and contended legal remedies were inadequate due to the continuing nature of the damage to bulkheads and unprotected property. Although the trial court found "[i]t is undisputed that significant erosion has occurred to certain properties," CP at 2643, the court did not find shellfish and other marine life faced imminent and irreparable elimination. Because the property owners have an adequate remedy at law in the form of monetary damages, they have not demonstrated they are entitled to the extraordinary remedy of injunctive relief.
Courts have generally found remedies to be inadequate in three circumstances: (1) the injury complained of by its nature cannot be compensated by money damages, (2) the damages cannot be ascertained with any degree of certainty, and (3) the remedy at law would not be efficient because the injury is of a continuing nature. 15 Lewis H. Orland & Karl B. Tegland, Washington Practice: Trial Practice, Civil § 646, at 468-69 (1996).
While it is true activities causing harm to the environment are frequently enjoined due to the irreparable nature of environmental injury, see, e.g., Amoco Prod. Co. v. Village of Gambell, AK, 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987), here the trial court focused on the physical injury to certain parcels of private property. The specific injuries complained of by the property owners decreased property values and damage to bulkheads, landscaping, and other structuresmay be easily compensated by money damages. See Steele v. Queen City Broad. Co., 54 Wash.2d 402, 341 P.2d 499 (1959) (damage remedy adequate compensation since owners were mainly concerned with the loss in value of their properties). Also, utilizing creative alternatives could prevent further damage to the shoreline property, without resorting to an injunction prohibiting the full-speed operation of the Chinook. See CP at 2652 (supplemental injunction order considering alternatives such as retrofitting the Chinook and installing floating breakwaters).
If the operation of the Chinook is found to be the cause of the alleged damages sustained by the property owners, a remedy is compensation for inverse condemnation under Wash. Const. art. I, § 16 (amend.9). "This court has held that in the interest of public policy, the State or a municipal corporation... will not be ousted if it has wrongfully taken possession of the land and is, in fact, devoting it to a public use. The owner will be left to his remedy at law to recover damages...." Brazil v. City of Auburn, 93 Wash.2d 484, 488, 610 P.2d 909 (1980). As the Chinook is unquestionably a public use, the property owners may be entitled to compensation if the operation of the ferry is the proven cause of damage to their property.[7] Thus, the property owners failed to demonstrate *70 the absence of a complete and adequate remedy at law.
B. Clear Legal or Equitable Right
In its preliminary injunction order limiting the speed of the Chinook, the trial court found as a matter of law "the requirements of SEPA clearly apply to the deployment and operation of the Chinook in the wave impact area." CP at 2644. Finding the requirements of SEPA applicable, the trial court tacitly concluded the property owners had demonstrated a clear legal right.
As an initial matter, amicus curiae Citizens for Reliable and Fair Transportation (CRAFT) contends the property owners have no protectable interest under SEPA because neither economic nor property interests are within the zone of interests protected by the statute. Br. of Amicus CRAFT at 8-9. This implied challenge to the property owners' standing is without merit.
A party wishing to challenge actions under SEPA must meet a two-part standing test: (1) the alleged endangered interest must fall within the zone of interests protected by SEPA, and (2) the party must allege an injury in fact. Leavitt v. Jefferson County, 74 Wash.App. 668, 678-79, 875 P.2d 681 (1994). The property owners here clearly meet both of these elements.
It is well established that purely economic interests are not within the zone of interests protected by SEPA. See, e.g., Snohomish County Property Rights Alliance v. Snohomish County, 76 Wash.App. 44, 52-53, 882 P.2d 807 (1994). However, the property owners here allege damage to the shoreline environment of Rich Passage, an interest plainly protected by SEPA.
SEPA is concerned with "broad questions of environmental impact, identification of unavoidable adverse environmental effects, choices between long and short term environmental uses, and identification of the commitment of environmental resources."
Id. (quoting DeWeese v. City of Port Townsend, 39 Wash.App. 369, 375, 693 P.2d 726 (1984)). While the property owners are undoubtedly motivated by a desire to protect the economic value of their properties, their SEPA claim is based on the State's alleged failure to consider the environmental effects of the Chinook, not its economic effects.
The injury in fact element is satisfied when a plaintiff alleges the challenged action will cause "specific and perceptible harm." Leavitt, 74 Wash.App. at 679, 875 P.2d 681. A sufficient injury in fact is properly pleaded when a property owner alleges "`immediate, concrete, and specific'" damage to property, even though the allegations may be "speculative and undocumented." Id. (quoting Trepanier v. City of Everett, 64 Wash.App. 380, 383, 824 P.2d 524 (1992)). As the property owners here have alleged damage to both private and public shorelines, they have properly pleaded a sufficient injury in fact.
Accordingly, the property owners clearly have standing to invoke SEPA. We next consider whether the trial court properly concluded the property owners demonstrated a clear legal right by ruling the requirements of SEPA apply to the deployment and operation of the Chinook.
SEPA recognizes the broad policy "that each person has a fundamental and inalienable right to a healthful environment...." RCW 43.21C.020(3). State agencies are required to use "all practicable means" to achieve the following goals:
(a) Fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;
(b) Assure for all people of Washington safe, healthful, productive and aesthetically and culturally pleasing surroundings;
(c) Attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences[.]
RCW 43.21C.020(2)(a)-(c). To further these objectives, SEPA requires that governmental agencies prepare environmental impact statements on "major actions having a probable significant, adverse environmental impact." RCW 43.21C.031(1). However, not every governmental decision or action is subject to review under SEPA. If an agency action is *71 categorically exempt or does not meet the definition of "action" as provided in WAC 197-11-704, an agency is not required to make a threshold determination of the environmental impacts of a proposed action. See WAC 197-11-310.
The administrative rules implementing SEPA identify two categories of "actions" that fall within the statute's scope: (1) project actions, and (2) nonproject actions. WAC 197-11-704. In the instant case, the trial court determined "the definition of `project action' does not appear to exclude the plan to deploy and operate the Chinook at 35 knots through Rich Passage." CP at 2645.
A "project action" is defined as:
[A] decision on a specific project, such as a construction or management activity located in a defined geographic area. Projects include and are limited to agency decisions to:
(i) License, fund, or undertake any activity that will directly modify the environment, whether the activity will be conducted by the agency, an applicant, or under contract.
(ii) Purchase, sell, lease, transfer, or exchange natural resources, including publicly owned land, whether or not the environment is directly modified.
WAC 197-11-704(2)(a).
Petitioners contend the "deployment and operation of a single vessel on an established route between established terminal facilities" does not constitute a "project action" under SEPA. Br. of Pet'r State at 29.[8] Respondents concede "[m]ost environmental assessments conducted for transportation projects focus on structures, such as the construction or physical expansion of an airport or marine terminal." Br. of Resp'ts at 59. But although no reported decision has explicitly held the deployment and operation of a vehicle of transportation on an established route constitutes a "project action" subject to SEPA, respondents correctly note courts frequently require environmental review of nonstructural transportation actions. See Downtown Traffic Planning Comm. v. Royer, 26 Wash.App. 156, 164-65, 612 P.2d 430 (1980) (holding decision to implement an exclusive bus lane program in downtown Seattle was subject to SEPA);[9]Development Servs. of Am., Inc. v. City of Seattle, 138 Wash.2d 107, 111, 979 P.2d 387 (1999) (noting SEPA review considered the noise and land use impacts of a proposed helistop).
A variety of transportation decisions have also been subject to environmental review under the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321.[10]See Cross-Sound Ferry Servs., Inc. v. United States, 573 F.2d 725, 732 (2d Cir.1978) (decision of Interstate Commerce Commission that operation of ferries would not significantly affect the environment was reached after compliance with initial procedural requirements of NEPA); Strahan v. Linnon, 967 F.Supp. 581, 629 (D.Mass.1997) (holding *72 Coast Guard vessel operations required preparation of an Environmental Assessment under NEPA), aff'd, 187 F.3d 623 (1st Cir. 1998); British Airways Bd. v. Port Authority of New York & New Jersey, 431 F.Supp. 1216, 1219 (S.D.N.Y.) (noting NEPA review was conducted before operating the Concorde), rev'd on other grounds by 558 F.2d 75 (2d Cir.1977); National Helicopter Corp. of Am. v. City of New York, 137 F.3d 81, 86 (2d Cir.1998) (corporation required to prepare an environmental impact statement to assess an existing heliport's noise effects on the environment); National Parks & Conservation Ass'n v. Federal Aviation Admin., 998 F.2d 1523, 1533 (10th Cir.1993) (reversing a finding of no significant impact under NEPA which approved construction, operation, and funding of an airport); Seattle Community Council Fed'n v. Federal Aviation Admin., 961 F.2d 829 (9th Cir.1992) (noting decision to alter flight patterns of turbine-powered aircraft using SeattleTacoma International Airport was subject to NEPA review). Thus, it is not unprecedented to require environmental review of nonstructural transportation actions.
When deciding whether a party has a clear legal or equitable right, the court examines the likelihood that the moving party will prevail on the merits. Rabon v. City of Seattle, 135 Wash.2d 278, 285, 957 P.2d 621 (1998). Although generally a reviewing court is not to adjudicate the ultimate rights in the case when addressing the propriety of a preliminary injunction, the "court may reach the merits of any purely legal question provided that the interim harm factor is undisputed." Id. (emphasis added). In the instant case, however, both parties vigorously dispute whether the operation of the Chinook actually causes harm to the environment. Were we to hold SEPA does or does not apply to the State's actions here, our decision "would be the equivalent of a decision on the merits, a task for which this court is ill suited." Federal Way Family Physicians, Inc. v. Tacoma Stands Up for Life, 106 Wash.2d 261, 267, 721 P.2d 946 (1986). Accordingly we assume, without deciding, that SEPA applies to the deployment and operation of the Chinook for the purpose of our interlocutory review.
C. Fear of Immediate Invasion
Assuming the property owners have a legal right to require the State to comply with the procedural requirements of SEPA, the property owners have clearly demonstrated a well-grounded fear of immediate invasion of that right.
The trial court found "it is undisputed that defendants conducted no formal and public environmental analysis under SEPA of the deployment or operation of the vessel prior to the commencement of the Chinook's operations." CP at 2642. Thus, if SEPA applies to the deployment and operation of the Chinook, the property owners have demonstrated an invasion of that right as it is undisputed the State failed to comply with SEPA's procedural requirements prior to the deployment and operation of the Chinook.
D. Actual and Substantial Injury
Petitioners argue the trial court abused its discretion by issuing a preliminary injunction without finding the operation of the Chinook is causing or will cause actual and substantial injury to the environment. Respondents, however, maintain the trial court properly issued the injunction without a finding of causation.
Although the trial court expressly made "no specific finding with regard to causation," it nevertheless issued the preliminary injunction requested by the property owners. The trial court reasoned:
Defendants contend that even if a SEPA violation is found, the requirements for injunctive relief must still be met, and that the plaintiffs must affirmatively show they have met those requirements. It is certainly true that nothing in the statute automatically requires an injunction upon a finding of a SEPA violation. However, both the caselaw and the policy underlying the Act strongly suggest that a total failure to follow the minimum requirements of SEPA in an environmentally-sensitive area does not require further proof of harm or a balancing of interests.
CP at 2051 (citing King County v. Washington State Boundary Review Bd., 122 Wash.2d 648, 663, 860 P.2d 1024 (1993)). The trial court's disregard of the traditional prerequisites for entering a preliminary injunction *73 has no basis in either state or federal law and thus constitutes an abuse of discretion.
The only case cited by the trial court in support of its departure from established law is King County v. Washington State Boundary Review Bd., 122 Wash.2d 648, 860 P.2d 1024. There, King County challenged the boundary review board's approval of a proposed annexation, arguing the determination of nonsignificance (DNS) for purposes of compliance with SEPA was clearly erroneous. We held the DNS was clearly erroneous and that an environmental impact statement (EIS) should have been issued. Id. at 667, 860 P.2d 1024. We then concluded:
In cases involving reversal of a DNS, it is necessary to remand to the agency for preparation of an EIS and enjoin the agency action until the statement is complete. We therefore reverse Black Diamond's DNS, enjoin the proposed annexations, and remand for further proceedings, including preparation of an EIS.

Id. (citations omitted).
Respondents maintain Washington State Boundary Review Board supports the proposition that "[i]f an immediate injunction against further agency action is necessary when a DNS is reversed, a fortiori, an immediate injunction against agency action in violation of SEPA is necessary where, as here, that agency did not even bother to follow the minimum requirement of producing an environmental checklist." Br. of Resp'ts at 82. We do not find this argument persuasive.
The reversal of a DNS necessarily implies that a particular proposal is likely to have a significant adverse environmental impact, thus mandating the preparation of an EIS. See WAC 197-11-734; XXX-XX-XXX. Here, however, the trial court explicitly stated "[s]ince no threshold determination was made by the State, at this time the Court does not have sufficient information to determine if a DNS would have been sufficient or if an EIS would be required." CP at 2646 n.8. Thus, although the trial court held the State's actions here triggered the threshold determination requirement, see WAC 197-11-310, there has been no determination at this point that the deployment or operation of the Chinook is likely to have a significant adverse environmental impact, nor that the necessary preconditions for injunctive relief have been met even if it did. If neither the deployment nor operation of the Chinook significantly and adversely impacts the environment, there is clearly no threatened harm to enjoin. We find it illogical to enjoin an action without first finding the action is the cause of the alleged environmental harm and further finding in a factually specific way that the criteria for injunctive relief have been met.
Not surprisingly, there are no Washington decisions that award injunctive relief without at least first finding the challenged action is likely to have a significant adverse environmental impact. In fact, of the cases cited by the respondents, all found that the preparation of an EIS and completion of the SEPA process was required before the challenged action could continue. See Eastlake Community Council v. Roanoke Assocs., Inc., 82 Wash.2d 475, 487, 513 P.2d 36, 76 A.L.R.3d 360 (1973) (failure to file an EIS prior to renewal of a building permit rendered the permit void); Sisley v. San Juan County, 89 Wash.2d 78, 87, 569 P.2d 712 (1977) (reversing DNS issued for construction of a marina and remanding for preparation of an EIS); Lassila v. City of Wenatchee, 89 Wash.2d 804, 816-17, 576 P.2d 54 (1978) (vacating amendment of city's comprehensive plan which contained environmental assessment but not an EIS); Noel v. Cole, 98 Wash.2d 375, 655 P.2d 245 (1982) (failure to prepare EIS prior to entering contract permitting logging on public land rendered contract ultra vires), superseded by statute on other grounds by Dioxin/Organochlorine Ctr. v. Pollution Control Hr'gs Bd., 131 Wash.2d 345, 932 P.2d 158 (1997). Further, not one of these decisions upheld the issuance of an injunction to remedy a SEPA violation. Instead, each case held that the failure to prepare an EIS rendered the challenged action void. Because "[w]e do not rely on cases that fail to specifically raise or decide an issue," In re Registration of Electric Lightwave, Inc., 123 Wash.2d 530, 541, 869 P.2d 1045 (1994), these cases cannot be *74 said to stand for the proposition that injunction relief is mandated following a SEPA violation.
The federal courts have consistently rejected the argument advanced by respondents when deciding whether to enjoin conduct in violation of NEPA.
In Sierra Club v. Hennessy, 695 F.2d 643 (2d Cir.1982), aff'd in part, rev'd in part on other grounds sub nom. Sierra Club v. United States Army Corps of Engineers, 701 F.2d 1011 (2d Cir.1983), the Second Circuit unequivocally stated:
A violation of NEPA does not necessarily require a reflexive resort to the drastic remedy of an injunction. In such cases, this Court has recognized that it must entertain normal considerations relative to the grant of equitable relief.
Id. at 648. And, in Conservation Law Found., Inc. v. Busey, 79 F.3d 1250, 157 A.L.R. Fed. 697 (1st Cir.1996), the court similarly denied injunctive relief even though it found NEPA had been violated.
As we emphasized [in Watt and Marsh], however, our holdings did not mean "that a likely NEPA violation automatically calls for an injunction; the balance of harms may point the other way."
Id. at 1272 (quoting Sierra Club v. Marsh, 872 F.2d 497, 504 (1st Cir.1989) (quoting Commonwealth v. Watt, 716 F.2d 946, 952 (1st Cir.1983))); see also Amoco Prod. Co., 480 U.S. 531, 107 S.Ct. 1396 (reversing holding that irreparable damage is presumed when an agency fails to evaluate thoroughly the environmental impact of a proposed action).
"An injunction is an extraordinary equitable remedy designed to prevent serious harm. Its purpose is not to protect a plaintiff from mere inconveniences or speculative and insubstantial injury." Tyler Pipe Indus., 96 Wash.2d at 796, 638 P.2d 1213. As the trial court explicitly made no finding with regard to causation, it cannot be said the respondents satisfied their burden of establishing actual and substantial harm in their request for injunctive relief.
E. Balancing Interests
Even assuming the Chinook is causing actual and substantial injury to the environment, the petitioners argue the trial court abused its discretion by issuing a preliminary injunction without balancing the relative interests of the parties and the public. We agree and find erroneous the conclusion that a "total failure to follow the minimum requirements of SEPA in an environmentally sensitive area does not require ... a balancing of interests." CP at 2051.
In Romero-Barcelo v. Brown, 478 F.Supp. 646 (D.Puerto Rico 1979), aff'd in part, vacated in part on other grounds by 643 F.2d 835 (1st Cir.1981) an action was brought seeking to enjoin the Navy from using the land and water surrounding an island in Puerto Rico for naval training operations. Although the Navy had taken no action to comply with the minimum requirements of NEPA, the court refused to enjoin the military activities pending compliance with NEPA without first balancing competing interests. The court reasoned:
Perhaps the most significant single component in the judicial decision whether to exercise equity jurisdiction and grant permanent injunctive relief, is the court's discretion. Being an extraordinary remedy, it is not granted routinely.
"We are dealing here with the requirements of equity practice with a background of several hundred years of history.... The historic injunctive process was designed to deter, not to punish. The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it."
. . . . .
If this balancing of competing interests is required where constitutional rights are at stake, can it be seriously argued that this Court should have a different standard where statutory matters are at issue? We think not.
Romero-Barcelo, 478 F.Supp. at 706 (quoting Hecht Co. v. Bowles, 321 U.S. 321, 329-30, 64 S.Ct. 587, 88 L.Ed. 754 (1944)). Because of the important public interests at stake and *75 the lack of clear environmental harm caused by the challenged activity, the Navy was permitted to continue its operations pending compliance with NEPA. Romero-Barcelo, 478 F.Supp. at 706-07.
In Strahan v. Linnon, the court concluded NEPA and the Endangered Species Act of 1973(ESA) 16 U.S.C. § 1531, applied to the Coast Guard's operation of its vessels. Although the Coast Guard had admittedly taken no action to comply with the minimum requirements of NEPA, the court refused to issue a preliminary injunction terminating the Coast Guard's operation of its vessels. Strahan, 967 F.Supp. 581, 615. In fact, the court noted that the ESA, a more restrictive environmental law, "if most strictly interpreted, could require the Coast Guard to cease all operations along the Atlantic Coast. Such an order would not be appropriate." Id. at 601.
In construing environmental statutes similar to NEPA, the federal courts have consistently suggested that the relief afforded must be the result of balancing of equities. In Weinberger v. Romero-Barcelo, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982), the Supreme Court held the Navy was not required to cease operations pending compliance with the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. § 1251. The Court first observed:
The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law.
Weinberger, 456 U.S. at 313, 102 S.Ct. 1798 (citation omitted). The Court then examined the language and structure of the FWPCA and concluded that Congress did not intend to deny courts their traditional equitable discretion. Id. at 319, 102 S.Ct. 1798.
Rather than requiring a district court to issue an injunction for any and all statutory violations, the FWPCA permits the district court to order that relief it considers necessary to secure prompt compliance with the Act. That relief can include, but is not limited to, an order of immediate cessation.

Id. at 320, 102 S.Ct. 1798.
In Amoco Prod. Co., 480 U.S. 531, 107 S.Ct. 1396, the Supreme Court rejected the presumption that injunctive relief is the appropriate remedy for a violation of an environmental statute absent rare or unusual circumstances. After examining the language and purpose of the statute at issue (the Alaska National Interest Lands Conservation Act), 16 U.S.C. § 3101, the Court concluded the Act simply "established a framework for reconciliation, where possible, of competing public interests." Amoco Prod. Co., 480 U.S. at 546, 107 S.Ct. 1396. Thus, rather than relying upon a presumption contrary to traditional equitable principles, the Court reaffirmed the bases for injunctive relief are irreparable injury and inadequacy of legal remedies, noting that in each case a court must balance competing claims. Id. at 542, 107 S.Ct. 1396.
Respondents contend the NEPA cases are inapplicable given the strong policy statements contained in SEPA. "This strong policy statement by the Legislature shows that courts need not `balance the equities' because the Legislature has already done the calculus in mandating compliance with SEPA." Br. of Resp'ts at 88. We disagree.
While it is true the public policy behind SEPA is stronger than that behind NEPA, the legislative adoption of SEPA was clearly not intended to prevent the consideration of competing factors when making a decision that potentially affects the environment.
[SEPA] does not require that those evaluating a proposed action consider environmental factors alone. Rather, the essential factors balanced frequently are the substantiality and likelihood of environmental cost and economic cost.
"[The environmental impact statement] is the basis upon which the responsible agency and officials can make the balancing judgment mandated by SEPA between the benefits to be gained by the proposed `major action' and its impact upon the environment." *76 ASARCO Inc. v. Air Quality Coalition, 92 Wash.2d 685, 714, 601 P.2d 501 (1979) (quoting Norway Hill Preservation & Protection Ass'n v. King County Council, 87 Wash.2d 267, 272-73, 552 P.2d 674 (1976)). As SEPA itself contemplates the balancing of economic and environmental factors, a trial court too must apply traditional equitable principles and weigh competing interests when asked to enjoin a challenged action.

CONCLUSION
Because the trial court did not consider whether the property owners have an adequate remedy at law, failed to find the high-speed operation of the Chinook causes actual and substantial injury, and refused to balance the relative interests of the parties and the public, the issuance of the injunction constitutes an abuse of discretion. "The court abused its discretion by failing to exercise discretion." Bowcutt v. Delta N. Star Corp., 95 Wash.App. 311, 321, 976 P.2d 643 (1999). Accordingly, we dissolve the preliminary injunction slowing the Chinook pending compliance with SEPA.[11]
We remand the case to the trial court for proceedings consistent with this opinion.
GUY, C.J., SMITH, MADSEN, ALEXANDER, TALMADGE, IRELAND, and BRIDGE, JJ., concur.
JOHNSON, J. (concurring).
I agree with the result reached by the majority, but write separately to address the applicability of the State Environmental Policy Act of 1971 (SEPA), chapter 43.21C RCW, and the adequacy of a remedy at law for a SEPA violation.
When considering the grant or denial of a request for a preliminary injunction, the trial court is expected to reach the merits of purely legal questions so as to evaluate the propriety of the injunction. Rabon v. City of Seattle, 135 Wash.2d 278, 286, 957 P.2d 621 (1998); Atwood v. Shanks, 91 Wash.App. 404, 410, 958 P.2d 332, review denied, 136 Wash.2d 1029, 972 P.2d 464 (1998). In this case, the trial court was faced with the question of whether respondents had asserted a clear legal or equitable right, as required for a temporary injunction to issue. See Rabon, 135 Wash.2d at 284, 957 P.2d 621 (citing Tyler Pipe Indus., Inc. v. Department of Revenue, 96 Wash.2d 785, 792, 638 P.2d 1213 (1982)). The trial court answered this question affirmatively by determining SEPA "clearly" applied to the facts of this case. Clerk's Papers at 2644 (Conclusion of Law 15).
In reaching this determination, the trial court entered extensive conclusions of law, and relied on the same cases cited by the majority. See majority at 71-72 (citing Downtown Traffic Planning Comm. v. Royer, 26 Wash.App. 156, 612 P.2d 430 (1980), overruled on other grounds by Dioxin/Organochlorine Ctr. v. Pollution Control Hearings Bd., 131 Wash.2d 345, 360, 932 P.2d 158 (1997); National Helicopter Corp. of Am. v. City of New York, 137 F.3d 81 (2d Cir.1998); National Parks & Conservation Ass'n v. Federal Aviation Admin., 998 F.2d 1523 (10th Cir.1993); Seattle Community Council Fed'n v. Federal Aviation Admin., 961 F.2d 829 (9th Cir.1992); British Airways Bd. v. Port Auth. of New York & New Jersey, 564 F.2d 1002 (2d Cir.1977); Strahan v. Linnon, 967 F.Supp. 581 (D.Mass. 1997), aff'd, 187 F.3d 623 (1st Cir.1998)).
The trial court's conclusions of law demonstrate that it took the first step in the Tyler Pipe analysis discussed by the majority, and reached the correct result. Tyler Pipe, 96 Wash.2d at 792, 638 P.2d 1213 (first step in analyzing availability of injunctive relief is to determine if the party seeking relief has a clear legal or equitable right) (citing Port of Seattle v. International Longshoremen's & Warehousemen's Union, 52 Wash.2d 317, 319, 324 P.2d 1099 (1958)).
*77 The majority does not affirm or reverse this legal conclusion of the trial court because the question of whether the Chinook passenger ferry causes harm to the environment is still in dispute. Majority at 72. But, as the majority later points out, this dispute relates to the next step in the preliminary injunction analysis, whether "`the acts complained of are either resulting in or will result in actual and substantial injury....'" Tyler Pipe, 96 Wash.2d at 792, 638 P.2d 1213 (quoting Port of Seattle, 52 Wash.2d at 319, 324 P.2d 1099); majority at 72. On remand, as the majority suggests, the trial court should reconsider the issue of actual harm in light of the "actual and substantial injury" prong of Tyler Pipe. Majority at 76 & n.11.
The conclusion that respondents have a clear legal right under SEPA, however, is based on the trial court's unchallenged factual findings that the State deployed the Chinook and the decision to do so had the potential for adverse affects on the environment. As the majority ably demonstrates, decisions regarding transportation deployment, regardless of whether they are "nonstructural," are subject to SEPA review. Majority at 71 (citing Downtown Traffic, 26 Wash.App. at 164-65, 612 P.2d 430; Development Servs. of Am., Inc. v. City of Seattle, 138 Wash.2d 107, 979 P.2d 387 (1999)). The same types of decisions are subject to review under the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321, and the policy of environmental protection underlying SEPA is "far stronger" than that behind NEPA. Majority at 71-72, 71 n.10; ASARCO Inc. v. Air Quality Coalition, 92 Wash.2d 685, 709, 601 P.2d 501 (1979) (citing Leschi Improvement Council v. Washington State Highway Comm'n, 84 Wash.2d 271, 279-80, 525 P.2d 774, 804 P.2d 1 (1974)). It seems redundant, therefore, for the trial court to reconsider its wholly correct legal conclusion that the "legal or equitable right" prong of Tyler Pipe is satisfied.
The majority further states that respondents must demonstrate their lack of a remedy at law in order for an injunction to issue under SEPA. While I agree that prior to issuance of an injunction this determination should be made, this should not prove difficult because the essence of a SEPA claim is harm to the environment. RCW 43.21C.010(2); RCW 43.21C.020; ASARCO Inc., 92 Wash.2d at 707, 601 P.2d 501; Eastlake Community Council v. Roanoke Assocs., Inc., 82 Wash.2d 475, 490, 513 P.2d 36, 76 A.L.R.3d 360 (1973); see also Sierra Club v. Marsh, 872 F.2d 497, 500-01, 504 (1st Cir.1989) (harm at stake under NEPA claim is harm to the environment). "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." Amoco Prod. Co. v. Village of Gambell, Alaska, 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).
The uniqueness of environmental actions in this regard is frequently recognized by federal courts in their analysis of injunctive relief under NEPA. See Forest Conservation Council v. United States Forest Serv., 66 F.3d 1489, 1496 (9th Cir.1995); City of S. Pasadena v. Slater, 56 F.Supp.2d 1106, 1142-43 (C.D.Cal.1999); Hells Canyon Preservation Council v. Jacoby, 9 F.Supp.2d 1216, 1245 (D.Or.1998). For example, in Forest Conservation Council, the Ninth Circuit explained that while a violation of NEPA does not per se mandate the issuance of an injunction, equitable relief is the appropriate remedy absent "unusual circumstances." Forest Conservation Council, 66 F.3d at 1496 (citing Amoco Prod. Co., 480 U.S. at 541, 544-45, 107 S.Ct. 1396; Thomas v. Peterson, 753 F.2d 754, 764 (9th Cir.1985); Alpine Lakes Protection Soc'y v. Schlapfer, 518 F.2d 1089, 1090 (9th Cir.1975)).
This analysis is even more compelling in the context of SEPA, because our Legislature has recognized that "each person has a fundamental and inalienable right to a healthful environment...." RCW 43.21C.020(3). As one commentator has noted:
A damages remedy under SEPA is by no means pre-ordained. The critical features of SEPA strive for protection and enhancement, goals realizable through injunctive *78 orders. SEPA treats environmental assets as something unique not simple items of trade covered comfortably by exchanges of dollars through the liability system. The emphasis is upon stemming the losses not calculating payoffs.
William H. Rodgers, Jr., The Washington Environmental Policy Act, 60 Wash. L.Rev. 33, 65 (1984-1985) (emphasis added). The language of SEPA displays a clear intent to protect public and as well as private interests. RCW 43.21C.010(1); RCW 43.21C.020(3); see also Rodgers, 60 Wash. L.Rev. at 65 (discussing anomaly of "private damages remedy for the loss of what are often very public assets...."). It is difficult to conceive of a legal remedy that could be "adequate" when a violation of SEPA harms public assets. State v. Ralph Williams' N.W. Chrysler Plymouth, Inc., 87 Wash.2d 298, 311, 553 P.2d 423 (1976) (remedy at law must be adequate to defeat issuance of injunction).
In sum, I agree with the majority's remand of this case for consideration of the Tyler Pipe factors the trial court failed to expressly examine.[1] I also agree that the traditional equitable analysis calls for examination of whether an adequate remedy at law exists, although presumably such a remedy will almost never be "adequate" under SEPA.
BRIDGE, J., concurs.
NOTES
[1] For a detailed history of the vessels and operations of the Washington State Ferries and its predecessors, see Mary Stiles Kline & George Albert Bayless, Ferryboats: A Legend on Puget Sound (1983).
[2] While the Tyee could travel at full speed between Bremerton and the west entrance of Rich Passage, the monohulls could not. Clerk's Papers (CP) at 1359-60.
[3] The parameters of the no-harm standard are 2,450 joules per meter (a measure of the wave's energy) for the highest wave in the wave train and a maximum wave height of 28 centimeters. In order to meet the no-harm standard, the State alleges the Chinook must travel at speeds equal to or greater than 34 knots.
[4] The property owners filed their case as a class action on behalf of "[a]ll persons who own waterfront property ... between Clam Bay and the Bremerton ferry landing ... and who have sustained [specified] damage since May 1998...." CP at 7. On October 15, 1999, the trial court certified the class respondents represent, consisting of waterfront property owners along Rich Passage and nearer to the Bremerton ferry dock, with the limitation that those pursuing tort damages must file tort claims as required by RCW 4.92.110. Apparently, there are several hundred parcels of real estate within the area described in the class certification order.
[5] The court defined the "wave impact area" as the portion of the ferry route between Bremerton and the entrance to Rich Passage at Orchard Point. CP at 2642 n.1.
[6] RCW 7.40.020 provides, in part: "When it appears by the complaint that the plaintiff is entitled to the relief demanded and the relief, or any part thereof, consists in restraining the commission or continuance of some act, the commission or continuance of which during the litigation would produce great injury to the plaintiff; or when during the litigation, it appears that the defendant is doing, or threatened, or is about to do, or is procuring, or is suffering some act to be done in violation of the plaintiff's rights respecting the subject of the action tending to render the judgment ineffectual; or where such relief, or any part thereof, consists in restraining proceedings upon any final order or judgment, an injunction may be granted to restrain such act or proceedings until the further order of the court, which may afterwards be dissolved or modified upon motion."
[7] Arguably, the trial court could enjoin activities constituting an uncompensated taking or damaging to have the property damage ascertained and paid before permitting the alleged inverse condemnation to continue. See Brown v. City of Seattle, 5 Wash. 35, 31 P. 313 (1892) (holding article I, section 16 of our state constitution, which provides that no private property shall be taken or damaged for public or private use without just compensation having been first made, provides basis for imposing an injunction preventing the grading of a street until city compensated property owner for damages).
[8] Similarly, amicus curiae Passenger Vessel Association (PVA) asserts "operational decisions assigning vessels and speeds are merely the implementation of the SEPA `action' establishing the route and service...." Br. of Amicus PVA at 8.
[9] In Dioxin/Organochlorine Ctr. v. Pollution Control Hr'gs Bd., 131 Wash.2d 345, 360, 932 P.2d 158 (1997), we held subsequent amendments to SEPA effectively overruled this portion of Downtown Traffic. We recognized that "[t]he entire purpose of the system of categorical exemptions is to avoid the high transaction costs and delays that would result from case by case review of categorically exempt types of actions...." Id. at 363, 932 P.2d 158. Thus, the premise of Downtown Traffic that courts may look beyond the nature of the activity to determine whether an otherwise categorically exempt activity is a major action requiring environmental reviewhas been rejected by Dioxin. Nevertheless, the notion that the type of decision involved in Downtown Traffic the modification or alteration of an existing transportation program (bus service)may be an "action" subject to environmental review has never been overruled.
[10] Amicus PVA asserts, "NEPA case law is irrelevant on this issue since SEPA has authorized administrative rules that define `action,' WAC 197-11-704, and NEPA has not." Br. of Amicus PVA at 10. Although the two statutes may contain slightly different definitions of the term "action," NEPA cases are nevertheless helpful in determining whether the deployment and operation of the Chinook is the type of agency action normally subject to environmental review. We have previously held "while NEPA and SEPA are substantially similar in intent and effect, ... the public policy behind SEPA is considerably stronger than that behind NEPA." ASARCO Inc. v. Air Quality Coalition, 92 Wash.2d 685, 709, 601 P.2d 501 (1979). Thus, it is reasonable to presume an "action" subject to NEPA may also be subject to SEPA.
[11] Respondents argue the State's violation of the SMA entitles them to a writ of mandamus and provides an alternative basis for upholding the trial court's decision. Br. of Resp'ts at 124. However, respondents did not raise this issue in their answer to petitioners' motions for discretionary review. As respondents did not properly preserve this issue for our review, we decline to address their SMA arguments. See RAP 13.7(b) (Supreme Court will review only the questions raised in the motion for discretionary review and answer). Of course dissolution of the preliminary injunction is without prejudice to future application.
[1] The trial court's examination of whether SEPA applies, however, may require little more than a recitation of the majority opinion's analysis.